[L.A. No. 30613. Feb. 24, 1977.]

HERBERT C. RAY, Plaintiff and Appellant, v.
ALAD CORPORATION, Defendant and Respondent.

**24**

**COUNSEL**

Silver & McWilliams, Lawrence Weitzer and Thomas G. Stolpman for Plaintiff and Appellant.

Robert E. Cartwright, Edward I. Pollock, Leroy Hersh, David B. Baum, Stephen I. Zetterberg, Robert G. Beloud, Ned Good, Arne Werchick, Sanford M. Gage, Roger H. Hedrick, Leonard Sacks and Joseph Posner as Amici Curiae on behalf of Plaintiff and Appellant.

Yusim, Cassidy, Stein, Hanger & Olson and Robert E. Levine for Defendant and Respondent.

Bell, Dunlavey & Rosenberg and James Dunlavey as Amici Curiae on behalf of Defendant and Respondent.

**OPINION**

**WRIGHT, J.***—Claiming damages for injury from a defective ladder, plaintiff asserts strict tort liability against defendant Alad Corporation (Alad II) which neither manufactured nor sold the ladder but prior to plaintiff's injury succeeded to the business of the ladder's manufacturer, the now dissolved "Alad Corporation" (Alad I), through a purchase of Alad I's assets for an adequate cash consideration. Upon acquiring Alad

---

*Retired Chief Justice of California sitting under assignment by the Acting Chairman of the Judicial Council.

I's plant, equipment, inventory, trade name, and good will, Alad II continued to manufacture the same line of ladders under the "Alad" name, using the same equipment, designs, and personnel, and soliciting Alad I's customers through the same sales representatives with no outward indication of any change in the ownership of the business. The trial court entered summary judgment for Alad II and plaintiff appeals.

■ Apart from tort liability for defective products, the hereinafter discussed rules of law applicable to Alad II's acquisition of this manufacturing business imposed no liability upon it for Alad I's obligations other than certain contractual liabilities that were expressly assumed. This insulation from its predecessor's liabilities of a corporation acquiring business assets has the undoubted advantage of promoting the free availability and transferability of capital. However, this advantage is outweighed under the narrow circumstances here presented by considerations favoring continued protection for injured users of defective products. As will be explained, these considerations include (1) the nonavailability to plaintiff of any adequate remedy against Alad I as a result of Alad I's liquidation prior to plaintiff's injury, (2) the availability to Alad II of the knowledge necessary for gauging the risks of injury from previously manufactured ladders together with the opportunity to provide for meeting the cost arising from those risks by spreading it among current purchasers of the product line and (3) the fact that the good will transferred to and enjoyed by Alad II could not have been enjoyed by Alad I without the burden of liability for defects in ladders sold under its aegis. Accordingly we have concluded that the instant claim of strict tort liability presents an exception to the general rule against imposition upon a successor corporation of its predecessor's liabilities and that the summary judgment should be reversed.

Plaintiff alleges in his complaint that on March 24, 1969, he fell from a defective ladder in the laundry room of the University of California at Los Angeles while working for the contracting company by which he was employed. The complaint was served on Alad II as a "Doe" defendant alleged to have manufactured the ladder. (See Code Civ. Proc., § 474.)[1] The Regents of the University of California (Regents) were named and served as a defendant on the basis of their ownership and control not only of the laundry room but of the ladder itself.

---

[1]The complaint also named Howard Manufacturing Company as manufacturer of the ladder, but plaintiff apparently had that company dismissed as a defendant before serving Alad II.

In granting summary judgment to Alad II,[2] the trial court considered not only the supporting and opposing declarations of witnesses with attached exhibits but also excerpts from depositions and answers to interrogatories. (See Code Civ. Proc., § 437c.) It is undisputed that the ladder involved in the accident was not made by Alad II and there was testimony that the ladder was an "old" model manufactured by Alad I. Hence the principal issue addressed by the parties' submissions on the motion for summary judgment was the presence or absence of any factual basis for imposing any liability of Alad I as manufacturer of the ladder upon Alad II as successor to Alad I's manufacturing business.

Prior to the sale of its principal business assets, Alad I was in "the specialty ladder business" and was known among commercial and industrial users of ladders as a "top quality manufacturer" of that product. On July 1, 1968, Alad I sold to Lighting Maintenance Corporation (Lighting) its "stock in trade, fixtures, equipment, trade name, inventory and goodwill" and its interest in the real property used for its manufacturing activities. The sale did not include Alad I's cash, receivables, unexpired insurance, or prepaid expenses. As part of the sale transaction Alad I agreed "to dissolve its corporate existence as soon as practical and [to] assist and cooperate with Lighting in the organization of a new corporation to be formed by Lighting under the name 'ALAD CORPORATION.'" Concurrently with the sale the principal stockholders of Alad I, Mr. and Mrs. William S. Hambly, agreed for a separate consideration not to compete with the purchased business for 42 months and to render nonexclusive consulting services during that period. By separate agreement Mr. Hambly was employed as a salaried consultant for the initial five months. There was ultimately paid to Alad I and the Hamblys "total cash consideration in excess of $207,000.00 plus interest for the assets and goodwill of ALAD [I]."

The only provisions in the sale agreement for any assumption of Alad I's liabilities by Lighting were that Lighting would (1) accept and pay for materials previously ordered by Alad I in the regular course of its business and (2) fill uncompleted orders taken by Alad I in the regular course of its business and hold Alad I harmless from any damages or liability resulting from failure to do so. The possibility of Lighting's or

---

[2]Alad II was granted separate summary judgments against plaintiff and against the Regents on their cross-complaint. Although only plaintiff has appealed, Alad II and the Regents have stipulated that the summary judgment against the Regents will stand or fall in accordance with the disposition of the summary judgment against plaintiff.

Alad II's being held liable for defects in products manufactured or sold by Alad I was not specifically discussed nor was any provision expressly made therefor.

On July 2, 1968, the day after acquiring Alad I's assets, Lighting filed and thereafter published a certificate of transacting business under the fictitious name of "Alad Co." (See former Civ. Code, § 2466.) Meanwhile Lighting's representatives had formed a new corporation under the name of "Stern Ladder Company." On August 30, 1968, there was filed with the Secretary of State (1) a certificate of winding up and dissolution of "Alad Corporation" (Alad I) and (2) a certificate of amendment to the articles of Stern Ladder Company changing its name to "Alad Corporation" (Alad II). The dissolution certificate declared that Alad I "has been completely wound up . . . [its] known debts and liabilities have been actually paid . . . [and its] known assets have been distributed to the shareholders." (See Corp. Code, former § 5200, now § 1905, subd. (a).) In due course Lighting transferred all the assets it had purchased from Alad I to Alad II in exchange for all of Alad II's outstanding stock.[3]

The tangible assets acquired by Lighting included Alad I's manufacturing plant, machinery, offices, office fixtures and equipment, and inventory of raw materials, semi-finished goods, and finished goods. These assets were used to continue the manufacturing operations without interruption except for the closing of the plant for about a week "for inventory." The factory personnel remained the same, and identical "extrusion plans" were used for producing the aluminum components of the ladders. The employee of Lighting designated as the enterprise's general manager as well as the other previous employees of Lighting were all without experience in the manufacture of ladders. The former general manager of Alad I, Mr. Hambly, remained with the business as a paid consultant for about six months after the takeover.

The "Alad" name was used for all ladders produced after the change of management. Besides the name, Lighting and Alad II acquired Alad I's lists of customers, whom they solicited, and continued to employ the salesman and manufacturer's representatives who had sold ladders for

---

[3]No contention is made that this transfer of the purchased assets to Alad II, contemplated as part of the overall purchase transaction, did not burden Alad II with whatever liabilities for Alad I's defective products Lighting had assumed by acquiring and operating the "Alad" business. (Cf. *Gordon* v. *Aztec Brewing Co.* (1949) 33 Cal.2d 514, 521-523 [203 P.2d 522].)

Alad I. Aside from a redesign of the logo, or corporate emblem, on the letterheads and labels, there was no indication on any of the printed materials to indicate that a new company was manufacturing Alad ladders, and the manufacturer's representatives were not instructed to notify customers of the change.

■ Our discussion of the law starts with the rule ordinarily applied to the determination of whether a corporation purchasing the principal assets of another corporation assumes the other's liabilities. As typically formulated the rule states that the purchaser does not assume the seller's liabilities unless (1) there is an express or implied agreement of assumption, (2) the transaction amounts to a consolidation or merger of the two corporations, (3) the purchasing corporation is a mere continuation of the seller, or (4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts. (See *Ortiz* v. *South Bend Lathe* (1975) 46 Cal.App.3d 842, 846 [120 Cal.Rptr. 556]; *Schwartz* v. *McGraw-Edison Co.* (1971) 14 Cal.App.3d 767, 780-781 [92 Cal.Rptr. 776]; *Pierce* v. *Riverside Mtg. Securities Co.* (1938) 25 Cal.App.2d 248, 255 [77 P.2d 226]; *Golden State Bottling Co.* v. *NLRB* (1973) 414 U.S. 168, 182 fn. 5 [38 L.Ed.2d 388, 402, 94 S.Ct. 414]; *Kloberdanz* v. *Joy Manufacturing Company* (D.Colo. 1968) 288 F.Supp. 817, 820 (applying California law); 15 Fletcher, Cyclopedia Corporations, § 7122.)

If this rule were determinative of Alad II's liability to plaintiff it would require us to affirm the summary judgment. None of the rule's four stated grounds for imposing liability on the purchasing corporation is present here. There was no express or implied agreement to assume liability for injury from defective products previously manufactured by Alad I. Nor is there any indication or contention that the transaction was prompted by any fraudulent purpose of escaping liability for Alad I's debts.

■ With respect to the second stated ground for liability, the purchase of Alad I's assets did not amount to a consolidation or merger. This exception has been invoked where one corporation takes all of another's assets without providing any consideration that could be made available to meet claims of the other's creditors (*Malone* v. *Red Top Cab Co.* (1936) 16 Cal.App.2d 268, 272-274 [60 P.2d 543]) or where the consideration consists wholly of shares of the purchaser's stock which are promptly distributed to the seller's shareholders in conjunction with the seller's liquidation (*Shannon* v. *Samuel Langston Company* (W.D.Mich.

1974) 379 F.Supp. 797, 801). In the present case the sole consideration given for Alad I's assets was cash in excess of $207,000. Of this amount Alad I was paid $70,000 when the assets were transferred and at the same time a promissory note was given to Alad I for almost $114,000. Shortly before the dissolution of Alad I the note was assigned to the Hamblys, Alad I's principal stockholders, and thereafter the note was paid in full. The remainder of the consideration went for closing expenses or was paid to the Hamblys for consulting services and their agreement not to compete. There is no contention that this consideration was inadequate or that the cash and promissory note given to Alad I were not included in the assets available to meet claims of Alad I's creditors at the time of dissolution. Hence the acquisition of Alad I's assets was not in the nature of a merger or consolidation for purposes of the aforesaid rule.

Plaintiff contends that the rule's third stated ground for liability makes Alad II liable as a mere continuation of Alad I in view of Alad II's acquisition of all Alad I's operating assets, its use of those assets and of Alad I's former employees to manufacture the same line of products, and its holding itself out to customers and the public as a continuation of the same enterprise. However, California decisions holding that a corporation acquiring the assets of another corporation is the latter's mere continuation and therefore liable for its debts have imposed such liability only upon a showing of one or both of the following factual elements: (1) no adequate consideration was given for the predecessor corporation's assets and made available for meeting the claims of its unsecured creditors; (2) one or more persons were officers, directors, or stockholders of both corporations. (See *Stanford Hotel Co.* v. *M. Schwind Co.* (1919) 180 Cal. 348, 354 [181 P. 780]; *Higgins* v. *Cal. Petroleum etc. Co.* (1898) 122 Cal. 373 [55 P. 155]; *Economy Refining & Service Co.* v. *Royal Nat. Bank of New York* (1971) 20 Cal.App.3d 434 [97 Cal.Rptr. 706, 49 A.L.R.3d 872]; *Blank* v. *Olcovich Shoe Corp.* (1937) 20 Cal.App.2d 456 [67 P.2d 376]; cf. *Malone* v. *Red Top Cab Co., supra,* 16 Cal.App.2d 268.) There is no showing of either of these elements in the present case.

Plaintiff relies on *Cyr* v. *B. Offen & Co., Inc.* (1st Cir. 1974) 501 F.2d 1145, 1152, where tort liability for injury from a defective product manufactured by an enterprise whose assets a corporation had acquired for adequate consideration in an arm's-length transaction was imposed on the corporation as a mere continuation of the enterprise.[4] We

---

[4]The assets were acquired not from a corporation but from the estate of a decedent who had operated the business as a sole proprietorship. (See 501 F.2d at p. 1151.)

hereafter refer to the *Cyr* case as helpful authority on the separate issue of what if any *special* rule should be applicable to a successor corporation's *tort* liability for its predecessor's *defective products.* We disagree, however, with any implication in *Cyr* or contention by plaintiff that the settled rule governing a corporation's succession to its predecessor's liabilities *generally* should be modified so as to require such succession merely because of the factors of continuity present in *Cyr* and in the instant case.

We therefore conclude that the general rule governing succession to liabilities does not require Alad II to respond to plaintiff's claim. **(1b)** In considering whether a special departure from that rule is called for by the policies underlying strict tort liability for defective products, we note the approach taken by the United States Supreme Court in determining whether an employer acquiring and continuing to operate a going business succeeds to the prior operator's obligations to employees and their bargaining representatives imposed by federal labor law. Although giving substantial weight to the general rules of state law making succession to the liabilities of an acquired going business dependent on the form and circumstances of the acquisition, the court refuses to be bound by these rules where their application would unduly thwart the public policies underlying the applicable labor law. (See *Howard Johnson Co.* v. *Hotel Employees* (1974) 417 U.S. 249, 257 [41 L.Ed.2d 46, 53-54, 94 S.Ct. 2236]; *Golden State Bottling Co.* v. *NLRB, supra,* 414 U.S. 168, 182 fn. 5.) Similarly we must decide whether the policies underlying strict tort liability for defective products call for a special exception to the rule that would otherwise insulate the present defendant from plaintiff's claim. (See *Turner* v. *Bituminous Cas. Co.* (1976) 397 Mich. 406 [244 N.W.2d 873, 877-878]; Note, *Assumption of Products Liability in Corporate Acquisitions* (1975) 55 B.U.L. Rev. 86, 107.)

The purpose of the rule of strict tort liability "is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves." (*Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 63 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049].) However, the rule "does not rest on the analysis of the financial strength or bargaining power of the parties to the particular action. It rests, rather, on the proposition that 'The cost of an injury and the loss of time or health may be an overwhelming misfortune

to the person injured, and a needless one, for the risk of injury can be insured by the manufacturer and distributed among the public as a cost of doing business.' (*Escola* v. *Coca Cola Bottling Co.,* 24 Cal.2d 453, 462 [150 P.2d 436] [concurring opinion].)" (*Seely* v. *White Motor Co.* (1965) 63 Cal.2d 9, 18-19 [45 Cal.Rptr. 17, 403 P.2d 145].) Thus, "the paramount policy to be promoted by the rule is the protection of otherwise defenseless victims of manufacturing defects and the *spreading through-out society* of the cost of compensating them." (Italics added.) (*Price* v. *Shell Oil Co.* (1970) 2 Cal.3d 245, 251 [85 Cal.Rptr. 178, 466 P.2d 722].) Justification for imposing strict liability upon a *successor* to a manu-facturer under the circumstances here presented rests upon (1) the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business, (2) the successor's ability to assume the original manufacturer's risk-spreading role, and (3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business. We turn to a consideration of each of these aspects in the context of the present case.

We must assume for purposes of the present proceeding that plaintiff was injured as a result of defects in a ladder manufactured by Alad I and therefore could assert strict tort liability against Alad I under the rule of *Greenman* v. *Yuba Power Products, Inc., supra,* 59 Cal.2d 57. However, the practical value of this right of recovery against the original manufacturer was vitiated by the purchase of Alad I's tangible assets, trade name and good will on behalf of Alad II (see fn. 3, *ante*) and the dissolution of Alad I within two months thereafter in accordance with the purchase agreement. The injury giving rise to plaintiff's claim against Alad I did not occur until more than six months after the filing of the dissolution certificate declaring that Alad I's "known debts and liabilities have been actually paid" and its "known assets have been distributed to its shareholders." This distribution of assets was perfectly proper as there was no requirement that provision be made for claims such as plaintiff's that had not yet come into existence.[5] Thus, even if plaintiff could obtain

---

[5]Former section 5000 of the Corporations Code, which was then in effect and has since been replaced by section 2004, provided:

"After determining that all the *known debts and liabilities* of a corporation in the process of winding up have been paid or adequately provided for, the directors shall distribute all the remaining corporate assets among the shareholders and owners of shares according to their respective rights and preferences. If the winding up is by court proceeding or subject to court supervision, the distribution shall not be made until after

a judgment on his claim against the dissolved and assetless Alad I (see Corp. Code, former § 5400, now § 2010, subd. (a)) he would face formidable and probably insuperable obstacles in attempting to obtain satisfaction of the judgment from former stockholders or directors. (See *Hoover* v. *Galbraith* (1972) 7 Cal.3d 519 [120 Cal.Rptr. 733, 498 P.2d 981]; *Trubowitch* v. *Riverbank Canning Co.* (1947) 30 Cal.2d 335, 345 [182 P.2d 182]; *Zinn* v. *Bright* (1970) 9 Cal.App.3d 188 [87 Cal.Rptr. 736]; Henn & Alexander, *Effect of Corporate Dissolution on Products Liability Claims* (1971) 56 Cornell L.Rev. 865; Wallach, *Products Liability: A Remedy in Search of a Defendant—The Effect of a Sale of Assets and Subsequent Dissolution on Product Dissatisfaction Claims* (1976) 41 Mo.L.Rev. 321; cf. Corp. Code, § 2009 (eff. Jan. 1, 1977).)

The record does not disclose whether Alad I had insurance against liability on plaintiff's claim. Although such coverage is not inconceivable (see *Kelley* v. *Indemnity Ins. Co. of North America* (1937) 252 App.Div. 58 [297 N.Y.S. 228], affd., 276 N.Y. 606 [12 N.E.2d 599] (coverage afforded by policy rider)) products liability insurance is usually limited to accidents or occurrences taking place while the policy is in effect. (See *Protex-A-Kar Co.* v. *Hartford Acc. etc. Co.* (1951) 102 Cal.App.2d 408 [227 P.2d 509]; *Bouton* v. *Litton Industries, Inc.* (3d Cir. 1970) 423 F.2d 643, 645-646; 11 Couch, Cyclopedia of Insurance Law (2d ed. 1963) § 44:385 (including cases cited in 1975-1976 cum. supp.).) Thus the products liability insurance of a company that has gone out of business is not a likely source of compensation for injury from a product the company previously manufactured.

These barriers to plaintiff's obtaining redress from the dissolved Alad I set him and similarly situated victims of defective products apart from persons entitled to recovery against a dissolved corporation on claims that were capable of being known at the time of its dissolution. Application to such victims of the general rule that immunizes Alad I's successor from the general run of its debts would create a far greater likelihood of complete denial of redress for a legitimate claim than

the expiration of any period for the presentation of claims which has been prescribed by order of court." (Italics added.)

In a liquidation proceeding subject to court supervision "the amount of any unmatured, contingent, or disputed claim against the corporation which has been presented and has not been disallowed" must be "paid into court" and suit on rejected claims must be commenced within 30 days after notice of rejection. (Corp. Code, former § 4608, now § 1807.) No provision need be made for the satisfaction of claims that may arise in the future on account of defective products the corporation has manufactured in the past.

would the rule's application to most other types of claimants. Although the resulting hardship would be alleviated for those injured plaintiffs in a position to assert their claims against an active and solvent retail dealer who sold the defective product by which they were injured, the retailer would in turn be cut off from the benefit of rights against the manufacturer. (See *Vandermark* v. *Ford Motor Co.* (1964) 61 Cal.2d 256, 262-263 [37 Cal.Rptr. 896, 391 P.2d 168]; *Escola* v. *Coca Cola Bottling Co.* (1944) 24 Cal.2d 453, 464 [150 P.2d 436] (conc. opn.).)[6]

While depriving plaintiff of redress against the ladder's manufacturer, Alad I, the transaction by which Alad II acquired Alad I's name and operating assets had the further effect of transferring to Alad II the resources that had previously been available to Alad I for meeting its responsibilities to persons injured by defects in ladders it had produced. These resources included not only the physical plant, the manufacturing equipment, and the inventories of raw material, work in process, and finished goods, but also the know-how available through the records of manufacturing designs, the continued employment of the factory personnel, and the consulting services of Alad I's general manager. With these facilities and sources of information, Alad II had virtually the same capacity as Alad I to estimate the risks of claims for injuries from defects in previously manufactured ladders for purposes of obtaining insurance coverage or planning self-insurance. (See *Cyr* v. *B. Offen & Co., Inc., supra,* 501 F.2d 1145, 1154.) Moreover, the acquisition of the Alad enterprise gave Alad II the opportunity formerly enjoyed by Alad I of passing on to purchasers of new "Alad" products the costs of meeting these risks. Immediately after the takeover it was Alad II, not Alad I, which was in a position to promote the "paramount policy" of the strict products liability rule by "spreading throughout society . . . the cost of compensating [otherwise defenseless victims of manufacturing defects]" (*Price* v. *Shell Oil Co., supra,* 2 Cal.3d 245, 251). (See *Knapp* v. *North American Rockwell Corp.* (3d Cir. 1974) 506 F.2d 361, 372-373 (conc. opn.).)

---

[6]In contrast to the present case in which the injury occurred after the liquidation and dissolution of the manufacturer is the situation found in *Schwartz* v. *McGraw-Edison Co., supra,* 14 Cal.App.3d 767. There the minor plaintiff's injuries occurred two years and ten months *before* the manufacturer's sale of its trade name and operating assets for cash. In connection with the sale the manufacturer gave its successor a 10-year lease of the real property on which the manufacturing business was conducted. Thus the *Schwartz* plaintiff's claim could have been asserted against the original manufacturer as a going concern for a substantial period following the injury, and even after the manufacturer had sold its operating assets the possibility of recovery against it was given practical value by its continued corporate existence and its retention of substantial assets. (See 14 Cal.App.3d at pp. 776-781.)

Finally, the imposition upon Alad II of liability for injuries from Alad I's defective products is fair and equitable in view of Alad II's acquisition of Alad I's trade name, good will, and customer lists, its continuing to produce the same line of ladders, and its holding itself out to potential customers as the same enterprise. This deliberate albeit legitimate exploitation of Alad I's established reputation as a going concern manufacturing a specific product line gave Alad II a substantial benefit which its predecessor could not have enjoyed without the burden of potential liability for injuries from previously manufactured units. Imposing this liability upon successor manufacturers in the position of Alad II not only causes the one "who takes the benefit [to] bear the burden" (Civ. Code, § 3521) but precludes any windfall to the predecessor that might otherwise result from (1) the reflection of an absence of such successor liability in an enhanced price paid by the successor for the business assets and (2) the liquidation of the predecessor resulting in avoidance of its responsibility for subsequent injuries from its defective products. (See *Turner* v. *Bituminous Cas. Co., supra,* 397 Mich. 406; *Cyr* v. *B. Offen & Co., Inc., supra,* 501 F.2d 1145, 1154; *Shannon* v. *Samuel Langston Company, supra,* 379 F.Supp. 797, 802; Note, *Expanding the Products Liability of Successor Corporations* (1976) 27 Hastings L.J. 1305.) By taking over and continuing the established business of producing and distributing Alad ladders, Alad II became "an integral part of the overall producing and marketing enterprise that should bear the cost of injuries resulting from defective products" (*Vandermark* v. *Ford Motor Co., supra,* 61 Cal.2d 256, 262).

We therefore conclude that a party which acquires a manufacturing business and continues the output of its line of products under the circumstances here presented assumes strict tort liability for defects in units of the same product line previously manufactured and distributed by the entity from which the business was acquired. Anything to the contrary in *Ortiz* v. *South Bend Lathe, supra,* 46 Cal.App.3d 842, or *Schwartz* v. *McGraw-Edison Co., supra,* 14 Cal.App.3d 767 (see fn. 6, *ante*) is disapproved.

The judgment is reversed.

Tobriner, Acting C. J., Mosk, J., Clark, J., Richardson, J., and Sullivan, J.,* concurred.

Respondent's petition for a rehearing was denied March 31, 1977.

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.