The DOWNTOWNER, INC., Coca-Cola Bottling Company of Bismarck; Northwest Billiard Supply, Inc.; d'Joyce Photography Inc., and Gold Seal Company, Plaintiffs and Appellants,

v.

ACROMETAL PRODUCTS, INC., Defendant.

and

ADAMS, INCORPORATED, Defendant, Third-Party Plaintiff and Appellant,

v.

WEATHER–RITE, INC., a corporation; and Acrometal Products, Inc., Third-Party Defendants and Appellees.

WEEDA'S BATH AND KITCHEN SHOP, Prairie West Casuals; Downtowner Investment Company; Special People, Inc.; and First Trust Company of North Dakota, Plaintiffs,

v.

ADAMS, INCORPORATED, Defendant, Third-Party Plaintiff and Appellant,

v.

WEATHER–RITE, INC., a corporation; Acrometal Products, Inc., a corporation and Continental Casualty Company, Third-Party Defendants and Appellees.

Civ. Nos. 10495, 10494.

Supreme Court of North Dakota.

March 21, 1984.

GIERKE, Justice.

These appeals are brought by the plaintiff, Downtowner, Inc., and by the defendant and third-party plaintiff, Adams, Inc., from a partial summary judgment entered in the District Court of Burleigh County in favor of defendant and third-party defendant, Acrometal Products, Inc. We affirm in part, reverse in part, and remand.

The plaintiffs, Downtowner, Inc., and Weeda's Bath and Kitchen Shop, commenced these actions by service of summons and complaint alleging products liability causes of action. Both complaints allege that sometime prior to January 1973 a corporation named Weather-Rite, Inc., manufactured a make-up air unit named the Thermo-O-Thrift, Model 212. This unit is a gas-fired heater. In January of 1973, the heater was sold by Weather-Rite through Adams, Inc., to Gerlach Sheet Metal of Bismarck for installation in The Downtowner, a Bismarck restaurant. The plaintiffs allege that in January 1978 the heater caused a fire which damaged the building in which the plaintiffs' businesses were located, with resultant damage to the plaintiffs' property. The only liability alleged against Adams is that it was in the chain of sale of the product.

Upon receipt of the summons and complaint, Adams brought claims against Weather-Rite and Acrometal, alleging its rights to indemnification, pursuant to § 28–01.1–07 of the North Dakota Century Code.[1] On December 8, 1981, Acrometal

---

1. Section 28–01.1–07, N.D.C.C., provides as follows:

"*28–01.1–07. Indemnity of seller.* If a product liability action is commenced against a seller, and it is alleged that a product was defectively designed, contained defectively manufactured parts, had insufficient safety guards, or had inaccurate or insufficient warnings; that such condition existed when the product left the control of the manufacturer; that the seller has not substantially altered the product; and that the defective condition or lack of safety guards or adequate warnings caused the injury or damage complained of; the manufacturer from whom the product was acquired by the seller shall be required to assume the cost of defense of the action, and any liability that may be imposed on the seller."

For purposes of § 28–01.1–07, "manufacturer" is defined in § 28–01.1–06(1), N.D.C.C., as follows:

"*28–01.1–06. Definitions applicable to sections 28–01.1–06 and 28–01.1–07.* For purposes of this section and section 28–01.1–07:

"1. 'Manufacturer' means a person or entity who designs, assembles, fabricates, produces, constructs, or otherwise prepares a product or a component part of a product prior to the sale of the product to a user or consumer. The term includes any seller who has actual knowledge of a defect in a product or a seller of a product who creates and furnishes a manufacturer with specifications, relevant to the alleged defect, for producing the product or who otherwise exercises some significant control over all or a portion of the manufacturing process or who alters or modifies a product in any significant manner after the product comes into his possession and before it is sold to the ultimate user or consumer. The term also includes any seller of a product who is owned in whole or significant part by the manufacturer or who owns, in whole or significant part, the manufacturer. A seller not otherwise a manufacturer shall not be deemed to be a manufacturer merely because he places or has placed a private label on a product if he:

a. Does not otherwise specify how the product shall be produced, or

b. Does not control, in some significant manner, the manufacturing process of the product,

and the seller discloses the actual manufacturer."

filed a motion for summary judgment which was granted. A Rule 54(b), N.D.R. Civ.P., order was entered and from the judgment Downtowner and Adams have appealed.[2]

Weather-Rite was a corporation formed sometime prior to 1968. It was in the business of manufacturing heating units of the type described in the complaints. Weather-Rite was responsible for the entire manufacturing process, from initial construction and testing of the unit to its actual shipment to distributors. Adams was a distributor of Weather-Rite products in North Dakota.

In 1974 Weather-Rite was in serious financial difficulty and foreclosure proceedings were being initiated by its financing bank. The company went into receivership in state court in Minnesota.

After the receivership had begun, Acrometal purchased the bulk of Weather-Rite's assets for cash. No stock was acquired. Only the assets were purchased, excluding buildings and real property.

Acrometal purchased these assets from two sources. Weather-Rite's financing bank executed an assignment to Acrometal of the bank's security interest in Weather-Rite's accounts receivable. The bank also executed a bill of sale to Acrometal of its security interest in Weather-Rite's inventory and contract rights. Acrometal also purchased certain of Weather-Rite's personal property from the bank. In addition, the court-appointed receiver executed a bill of sale to Acrometal of Weather-Rite's re-

maining assets. On October 18, 1974, the District Court of Hennepin County, Minnesota, approved the sale. Neither the documents of transfer nor the order of approval recite any assumption by Acrometal of Weather-Rite's liabilities. Weather-Rite became a mere corporate shell.

In addition to the purchase of Weather-Rite's assets, a number of Weather-Rite's employees were also hired by Acrometal. Among these employees was Richard Cowan, the chief engineer, sales manager, and vice president of Weather-Rite. Also hired was John Nagan, the president of Weather-Rite. During the transition period, the manufacturing process never ceased for any substantial length of time. Products were manufactured almost continuously, either by Weather-Rite or Acrometal. Weather-Rite's operations, however, were gradually shut down at its St. Paul plant and the manufacturing process was begun at Acrometal's Minneapolis facility.

During the manufacturing process under Acrometal, the designs of the Weather-Rite products did not substantially change. The same sales network was used, and customer lists and other files were obtained by Acrometal. The heating units were at all times marketed under the Weather-Rite name, with substantially the same marketing technique. No mention was made of Acrometal, except in small print on the last page of its promotional brochure.

Acrometal also honored the warranties of products manufactured and sold by Weather-Rite and filled the orders which were in existence at the time of the pur-

Because of our holding in this case we need not determine whether Acrometal qualifies as a "manufacturer" under the terms of these statutes.

**2.** In the "Downtowner" case (Civil No. 10,495), the original complaint named only Adams as a defendant. Adams then served its third-party complaint on Acrometal. Through a second amended complaint, Downtowner made Acrometal a main-party defendant, along with Adams. Adams then filed a cross-claim against Acrometal. The third-party complaint was never formally dismissed, although the allegations in the third-party complaint were replaced by those in the cross-claim. Since the third-party

complaint was never formally dismissed, it still appears in the caption.

After this appeal was commenced, Adams entered into a settlement agreement with the plaintiffs in "Downtowner", under which the plaintiffs' claims against Adams were dismissed. The plaintiffs and Adams reserved all rights to pursue their respective claims against Acrometal.

In the "Weeda's Bath" case (Civil No. 10,494), Acrometal was never made a main-party defendant, but remains a third-party defendant.

During the course of this appeal Adams settled with the plaintiffs in "Weeda's Bath". Adams, however, reserved its claims against Acrometal.

chase of assets. Acrometal is now the source for replacement parts for the units. All of this was accomplished through the "Weather-Rite" division of Acrometal.

■ The sole issue on appeal is whether or not the district court erred in granting summary judgment to Acrometal Products, Inc. Summary judgment is a procedural device designed to dispose of a legal conflict on the merits without a trial if there is no dispute as to material facts or where only a question of law is involved. Rule 56, North Dakota Rules of Civil Procedure. *Roll v. Keller*, 336 N.W.2d 648, 650 (N.D.1983). Where different inferences may be drawn from agreed-upon facts, they must be drawn in favor of the party opposing summary judgment. *Sheets v. Letnes, Marshall & Fiedler, Ltd.*, 311 N.W.2d 175, 180 (N.D.1981). There is no dispute regarding the facts of this case. There is also no dispute regarding the law of successor corporate liability as it existed in North Dakota at the time of the fire. The principal question raised by this appeal is whether or not North Dakota should join a minority of jurisdictions which have either expanded upon the "mere continuation" exception to the rule of successor corporate liability or have granted a separate exception to the general rule. Appellants also urge that the summary judgment be reversed on the basis that Acrometal knew of problems with the Weather-Rite heaters and failed to warn Weather-Rite's customers of those problems.

## I

■ The long-established general rule is that a corporation which purchases the assets of another corporation does not succeed to the liabilities of the selling corporation. There are, however, four well-recognized exceptions to the general rule under which liability may be imposed on a purchasing corporation:

1.  Where there is an express or implied agreement to assume the transferor's liabilities;

2.  Where the transaction amounts to a consolidation or merger of the two corporations;

3.  Where the transferee corporation is merely a continuation of the transferor corporation; or

4.  The transaction is an attempt to defraud the creditors of the corporation.

*Leannais v. Cincinnati, Inc.*, 565 F.2d 437 (7th Cir.1977); *Cyr v. B. Offen & Co., Inc.*, 501 F.2d 1145 (1st Cir.1974). A further exception has been recognized where some of the elements of a purchaser in good faith are absent. *Cyr v. B. Offen & Co., Inc., supra* 501 F.2d at 1152.

Under neither this general rule nor its exceptions would Acrometal be liable for any damage resulting from a defect in the equipment manufactured by Weather-Rite.

The traditional rule of corporate nonliability was developed in response to the need to protect a bona fide purchaser from the unassumed debt liability of its predecessor. L. Frumer & M. Friedman, 1 Products Liability § 5.06 (1980). A number of courts, however, have evidenced a concern that this rule, when applied to products liability cases, serves to frustrate the policies on which the strict products liability theory is premised. These courts have therefore deviated from the strict application of the general rule in the products liability context. Two of the cases relied on by the appellants are illustrative of the approaches taken by these courts.

In *Turner v. Bituminous Cas. Co.*, 397 Mich. 406, 244 N.W.2d 873 (1976), the Michigan Supreme Court expanded the merger and continuation exceptions and held that a successor corporation may be liable if the totality of the transaction demonstrates the basic continuity of the enterprise. The traditional requirement for a de facto merger was the purchase of assets with the stock of the purchasing corporation. In *Turner, supra,* the Michigan court refused to recognize a distinction between the purchase of assets with cash and the purchase of assets with the stock of the purchasing

corporation. In reference to this distinction, the *Turner* court stated that:

"The stated difference between a stock payment and a cash payment is that in the first situation there is a commonality of ownership....

.    .    .    .    .

"The reasoning behind this must be that shareholders of the first company, become, as a result of the stock transfer, shareholders of the second corporation. Technically, this argument is strong. The presence of stock as consideration should be one factor to use to determine whether there exists a sufficient nexus between the successor and predecessor corporations to establish successor liability. However, the absence of an exchange of stock should not be conclusive.... The continuity of shareholders is apt to be a paper one, more symbolic than real....

.    .    .    .    .

"Summarizing then, logically and teleologically, there is no basis for treating a purchase of corporate assets different from a de facto merger. Both the injured party and the transferee corporation have common goals in each situation. It would make better sense if the law had a common result and allowed a products liability recovery in each case." *Turner, supra* 244 N.W.2d at 879–880.

The *Turner* court then ruled that evidence of the following would make out a prima facie case of continuation sufficient to impose liability on the successor corporation:

"1) There was basic continuity of the enterprise of the seller corporation, including, apparently, a retention of key personnel, assets, general business operations, and even the Sheridan name.

"2) The seller corporation ceased ordinary business operations, liquidated, and dissolved soon after distribution of consideration received from the buying corporation.

"3) The purchasing corporation assumed those liabilities and obligations of the seller ordinarily necessary for the continuation of the normal business operations of the seller corporation.

"4) The purchasing corporation held itself out to the world as the effective continuation of the seller corporation." *Turner, supra* 244 N.W.2d at 883–884. The first three factors are among the traditional requirements for a de facto merger.

The second case relied upon by the appellants is *Ray v. Alad Corporation*, 19 Cal.3d 22, 136 Cal.Rptr. 574, 560 P.2d 3 (1977). In that case the California Supreme Court, rather than modifying the traditional exceptions, created a new exception to the traditional rule of successor nonliability. The new rule is applicable only to tort liability for a defective product and is generally known as the "product line" theory.

In *Ray, supra*, a ladder manufactured in 1952 by a family corporation was alleged to have caused an injury in 1969. In 1968, however, the family corporation had sold all of its assets to another corporation which eventually took the same name as its predecessor. The court, in imposing liability on the successor corporation, reasoned that the purpose of strict tort liability is to ensure that the costs of injury are borne by the manufacturer rather than the consumer. The court justified its holding on the following grounds:

"(1) [T]he nonavailability to plaintiff of any adequate remedy against Alad I as a result of Alad I's liquidation prior to plaintiff's injury,

"(2) The availability to Alad II of the knowledge necessary for gauging the risks of injury from previously manufactured ladders together with the opportunity to provide for meeting the cost arising from those risks by spreading it among current purchasers of the product line, and

"(3) The fact that the good will transferred to and enjoyed by Alad II could not have been enjoyed by Alad I without the burden of liability for defects in ladders and sold under its

aegis." *Ray v. Alad Corp., supra* 136 Cal.Rptr. at 576, 560 P.2d at 5.

In *Johnson v. American Motors Corporation*, 225 N.W.2d 57, 66 (N.D.1974), this court adopted as the law in North Dakota the rule of strict liability in tort as set forth in § 402A, 2 Restatement of Torts 2d:

"Special Liability of Seller of Product for Physical Harm to User or Consumer

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property if

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

"(a) the seller has exercised all possible care in the preparation and sale of his product, and

"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

We then quoted from *Greenman v. Yuba Power Products, Inc.*, 59 Cal.2d 57, 27 Cal. Rptr. 697, 701, 377 P.2d 897, 901 (1962), to the effect that the adoption of the Restatement rule would

" '... insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves.' "

*Johnson, supra* 225 N.W.2d at 66.

█ It is obvious that under the Restatement rule set forth above, Acrometal cannot be held strictly liable in its own right for the damage to plaintiffs' property. Acrometal neither manufactured the allegedly defective product nor did it participate in any way in the chain of sale. Were we to impose liability on Acrometal in this circumstance it would be liability without duty; thereby removing strict liability from the realm of tort. This we refuse to do. If Acrometal is to be held liable, it must be because Weather-Rite's potential liabilities were assumed with the purchase of assets. Such a finding would require a significant change in corporate law. We would have to hold that the policies of strict liability justify a finding that, though a corporation has dissolved, potential liability should not dissolve with it and that a purchaser of the assets of the dissolved corporation should assume that liability.

The cases advanced by the plaintiffs offer three justifications for making this change. The first is that an injured party has lost his remedy against the original corporation and has no one to sue but the successor. In *Ray v. Alad, Corp., supra* 136 Cal.Rptr. at 580, 560 P.2d at 9, the California Court speaks in terms of "the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business ...." We first note that this is not a justification, it is the problem. *Manh Hung Nguyen v. Johnson Mach. & Press*, 104 Ill.App.3d 1141, 60 Ill.Dec. 866, 873, 433 N.E.2d 1104, 1111 (1982). Additionally, under the facts of this case, Acrometal was not responsible for the destruction of the plaintiffs' remedy, where Weather-Rite had been threatened with foreclosure and was in receivership.[3]

The second justification offered is that Acrometal has benefited from Weather-Rite's accumulated good will and has, therefore, received a benefit from the sale of Weather-Rite's products. Since liability

---

**3.** Closely related to this "justification" is the concern expressed by many courts that a plaintiff is unable to protect himself from injury caused by defective products. The vast majority of cases cited by the appellants involve bodily injury. It has, however, been held that where the injury complained of is to property, the expansion of the "mere continuation" exception and the adoption of the "product line" exception is unwarranted. *State ex rel. Donahue v. Perkins & Will Architects, Inc.*, 90 Ill.App.3d 349, 45 Ill.Dec. 696, 413 N.E.2d 29 (1980). *See also* Fletcher Cyclopedia of the Law of Private Corporations § 7123 (Supp.)

should be imposed on those who benefit from the sale of the defective product, liability should be imposed on Acrometal. While this justification has some appeal, we do not believe it is sufficient in itself to justify a significant change in corporate law.

The final and primary justification offered is to ensure that the costs of injuries resulting from defective products are borne by those best able to gauge the risks of those costs, protect against them, and pass the costs on to the consumer. *Ray v. Alad, supra* 136 Cal.Rptr. at 580, 560 P.2d at 9; *Turner v. Bituminous Cas. Co., supra* 244 N.W.2d at 881 [quoting *Cyr v. B. Offen & Co., Inc.,* 501 F.2d 1145, 1154 (1st Cir.1974) ]; *Ramirez v. Ansted Industries, Inc.,* 171 N.J.Super. 261, 408 A.2d 818, 823 (1979).

In *Manh Hung Nguyen, supra* 60 Ill. Dec. at 873, 433 N.E.2d at 1111, the Court discussed this justification:

"Standing alone without other justification, this principle can hardly be used to make a fundamental change in corporate law. We would be simply saying that the successor should be liable because it can afford liability. Even if it were sufficient justification, we do not know whether the proposition is true. Recent studies indicate that many manufacturers, and in particular small manufacturers, have a difficult problem obtaining products liability insurance and find it impossible to cover the risks by raising prices because they have to compete with larger manufacturers who can keep the price down. [Citations omitted.] Additionally, it is one thing to assume that a manufacturer can acquire insurance against potential liability for its own products and another to assume it can acquire such insurance for the products made by a different manufacturer. We do not know whether insurance companies will readily provide such insurance. We cannot assume it as fact.

"When liability is imposed because a party has a duty to prevent injury, the ability to afford such liability is not of major importance. Thus, in most strict liability cases, the ability or inability of the defendant to bear the costs of that liability will not prevent liability. The defendant has violated a duty and should be made liable for the violation. However, when the issue is whether successor corporations should assume the liability of their predecessors, and the primary justification for the assumption is the successors' ability to bear the costs, then before the successors should be required to bear the costs we must be sure they can do so. Legislatures and not courts are in a much better position to determine the issue. Legislatures can do studies, gather evidence, hold hearings, and come to a decision. It is not a decision that can be made in a court proceeding where all of the parties truly involved are not represented."

In *Leannais v. Cincinnati, Inc.,* 565 F.2d 437 (7th Cir.1977), on remand, 480 F.Supp. 286 (E.D.Wis.1977), the Seventh Circuit Court of Appeals voiced a similar concern regarding court-imposed liability on successor corporations:

"It is on occasion absolutely necessary, if justice be done, for courts to 'legislate' within the 'interstices' of a statute, or by analogy to other laws and judicial precedents. In recent years, for a variety of reasons, many have thought it necessary to turn to the courts in search of solutions to social problems. Courts are ill-equipped, however, to balance equities among future plaintiffs and defendants. Such forays can result in wide-ranging ramifications on society, the contemplation of which is precluded by the exigencies of deciding a particular case presented on a limited record developed by present parties.... [S]uch broad public policy issues are best handled by legislatures with their comprehensive machinery for public input and debate."

*See also Bernard v. Kee Mfg. Co., Inc.,* 394 So.2d 552 (Fla.App.1981).

We recognize that there are some good social arguments for a rule imposing strict liability upon any successor corporation which has maintained the product line of its

predecessor. We nevertheless agree with the courts cited above that the legislature and not the courts should be responsible for the adoption of such a rule. We therefore conclude that the established principles pertaining to the liability of a cash purchaser of assets are applicable to products liability cases. We affirm the summary judgment entered in favor of Acrometal insofar as it pertains to the issues discussed above.

## II

The second theory of liability advanced by the appellants is that Acrometal, apart from liability as a successor, acquired an independent duty to warn of potential dangers presented by the heating units manufactured by Weather-Rite upon receiving notice of those dangers.

■ It is clear that a successor corporation may acquire an independent duty to warn where defects in its predecessor's products come to its attention. *See Gee v. Tenneco, Inc.,* 615 F.2d 857 (9th Cir.1980) [construing California law]; *Leannais v. Cincinnati, Inc.,* 565 F.2d 437 (7th Cir. 1977), *on remand* 480 F.Supp. 286 (E.D. Wis.1977); *Shane v. Hobam, Inc.,* 332 F.Supp. 526 (E.D.Pa.1971); *Wilson v. Fare-Well Corp.,* 140 N.J.Super. 476, 356 A.2d 458 (1976). Succession alone, however, does not impose a duty to warn of recently discovered defects. *See Gee v. Tenneco, Inc., supra: Travis v. Harris Corp.,* 565 F.2d 443 (7th Cir.1977); *Chadwick v. Air Reduction Co.,* 239 F.Supp. 247 (N.D.Ohio 1965).

The common thread running through these decisions imposing an independent duty to warn upon a successor corporation is the establishment of a relationship between the successor and its predecessor's customers. *Tucker v. Paxson Mach. Co.,* 645 F.2d 620, 626 (9th Cir.1981). Various factors have been considered to establish this nexus, for example: where the successor had inherited the service contracts which included responsibility for servicing the defective product; coverage of the particular product under the service contract; service of the product by the successor; and the successor's knowledge of the location and owner of the machine. *Travis v. Harris Corp., supra* 565 F.2d at 545; *Shane v. Hobam, Inc., supra; Wilson v. Fare-Well Corp., supra.* This listing cannot be said to be exhaustive. Rather than relying upon specific factors, the courts appear to have employed a risk/benefit analysis to determine whether it would be just to impose such a duty.

■ The determination of whether or not there is a nexus between Acrometal and the customers of Weather-Rite sufficient to justify the imposition of liability on Acrometal for the negligent breach of a duty to warn, necessarily involves questions of fact regarding that relationship. The parties appear to concede that discovery is incomplete in this case. We therefore conclude that, on the issue of Acrometal's alleged negligent failure to warn of defects in Weather-Rite's products, the summary judgment must be reversed and remanded to the district court for further proceedings. We do not mean to imply by our remarks that, on the present state of the record, the appellants would be entitled to have the issue submitted to the jury.

For the reasons stated in this opinion, the judgment is affirmed in part, reversed in part, and remanded.

ERICKSTAD, C.J., and PEDERSON, VANDE WALLE and SAND, JJ., concur.