**Carolyn M. HAMAKER, Plaintiff and Appellant,**

v.

**KENWEL–JACKSON MACHINE, INC., Defendant and Appellee.**

**No. 15152.**

Supreme Court of South Dakota.

Argued March 18, 1986.

Decided May 14, 1986.

Bradley G. Bonynge, Sioux Falls, for plaintiff and appellant.

Timothy Nimick, Woods, Fuller, Shultz & Smith, Sioux Falls, for defendant and appellee; Arlo Sommervold, Woods, Fuller, Shultz & Smith, Sioux Falls, on brief.

SABERS, Justice.

The user of a notching machine brought an action against the corporate successor of the notcher's original manufacturer for injuries sustained while using the machine. The trial court granted summary judgment for the corporate successor, and the user appeals. We affirm.

### Statement of Facts

On March 6, 1981, appellant Carolyn M. Hamaker (Hamaker), sustained injuries while operating a notcher machine incident to her employment at Dakota Pallets and Wood Products, Inc., in Alcester, South Dakota. She caught her left hand in the notcher blade and severed the second, third, fourth, and fifth fingers. She sought damages from the appellee, Kenwel-Jackson Machine, Inc. (Kenwel-Jackson), alleging various grounds of product liability including strict liability in tort, negligence, and breach of express and implied warranties.

The machine, a model 3072 notcher, was manufactured by appellee's predecessor, Kenwel Machine Company, Inc. (Kenwel). It was originally sold on May 21, 1969, to Harold Newton of Marshfield, Missouri. Sometime after it started production of the model 3072 notcher, Kenwel made several design changes and began manufacturing its successor which bore the model number 3072A.

On December 31, 1975, Kenwel sold its assets to John S. and Rosemary H. Jackson, husband and wife, for the cash sum of $140,000.00. Thereafter, Kenwel ceased business operations, and its corporate exist-

ence was terminated eighteen months later in August of 1977.

Pursuant to the purchase agreement executed between Kenwel and the Jacksons on January 30, 1976, the Jacksons bought the following assets: machinery, equipment, hand tools, furniture, fixtures, leasehold improvements, patent rights, accounts receivable, inventory, and goodwill. They did not purchase the patent for notcher model 3072. Nor did the Jacksons purchase any corporate stock from Kenwel. The purchase agreement contained the following provision:

IV. CONDITIONS. This Offer To Purchase is expressly subject to, and conditional upon, the occurrence of each of the following conditions:

. . . .

6. The agreement by the Seller to discharge or to provide for all liabilities of the Seller as of the date of closing, so that the Purchaser shall have no accounts payable, taxes due, or any other kind or type of current or long term liabilities incurred and unsatisfied as of the date of closing, except, however, commitments for materials ordered from suppliers.

Following the sale, the Jacksons formed the appellee corporation, Kenwel-Jackson, which began its corporate existence on February 2, 1976. No officer or director of Kenwel was ever an officer, director, stockholder, or employee of Kenwel-Jackson. Nor was there any transfer of top management personnel from the old to the new corporation. However, three craftsmen formerly employed by the predecessor corporation were retained by Kenwel-Jackson; one eventually became a vice president in charge of manufacturing.

Kenwel-Jackson was primarily interested in developing all types of board or lumber stackers. It cultivated different customers than its predecessor by marketing lumber stackers for the building component industry. Although Kenwel-Jackson continued to manufacture the model 3072A notching machine as well as its successors, models 3072B and 3072C, respectively, Kenwel-Jackson never participated in the design, manufacture, or sale of the model 3072 notcher which allegedly caused Hamaker's injuries. Kenwel-Jackson remained active in the manufacturing business until September of 1984.

### Issue

The issue is whether Kenwel-Jackson, as the successor corporation, can be held liable for Hamaker's injuries under "continuity of enterprise" or "merger" theories, or under the "product line" theory of strict tort liability.

### Summary Judgment

Hamaker argues generally that the trial court erred in disposing of this matter through summary judgment. However, no specific factual disputes are asserted by her to support her argument.

In summary judgment, the burden of proof is on the moving party to show clearly that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. The evidence must be viewed most favorably to the nonmoving party and reasonable doubts should be resolved against the moving party. Summary judgment is an extreme remedy and is not intended as a substitute for a trial. *Wilson v. Great Northern Railway Company*, 83 S.D. 207, 212, 157 N.W.2d 19, 21 (1968). Accordingly, summary judgment is appropriate to dispose of legal, not factual questions. Since no genuine issue of material fact exists in this case, the legal questions may be appropriately decided by summary judgment.

Our review of a trial court order granting summary judgment leads to an affirmance if any basis exists which supports the ruling. *Uken v. Sloat*, 296 N.W.2d 540, 542 (S.D.1980), *Maryland Cas. Co. v. Delzer*, 283 N.W.2d 244 (S.D.1979).

### Liability as Successor Corporation

In granting Kenwel-Jackson's motion for summary judgment, the trial court relied heavily on the Nebraska Supreme Court's

decision in *Jones v. Johnson Mach. & Press Co., Etc.,* 320 N.W.2d 481 (1982). In this case, the plaintiff sought to recover damages in a products liability action for injuries he sustained while operating a punch press which was manufactured by one of the corporate defendants. A default judgment was entered against the corporate defendant which manufactured the press. The remaining defendants, (other than the plaintiff's employer), were successor corporations which subsequently manufactured, distributed, and sold the same type of press.

■■■ The issue of successor corporate liability in *Jones* was one of first impression in Nebraska, just as it is in South Dakota. The general rule is that a corporation which purchases the assets of another corporation does not succeed to the liabilities of the selling corporation. *Id.* at 483; *Downtowner, Inc. v. Acrometal Products Inc.,* 347 N.W.2d 118, 121 (N.D. 1984); *Leannais v. Cincinnati, Inc.,* 565 F.2d 437, 439 (7th Cir.1977). There are, however, four exceptions to the general rule under which liability may be imposed on a purchasing corporation. They are:

(1) when the purchasing corporation expressly or impliedly agrees to assume the selling corporation's liability;

(2) when the transaction amounts to a consolidation or merger of the purchaser and seller corporations;

(3) when the purchaser corporation is merely a continuation of the seller corporation; or

(4) when the transaction is entered into fraudulently to escape liability for such obligations.

*Jones,* 320 N.W.2d at 483. (citations omitted). In finding that plaintiff's claim of liability did not fit under any of the exceptions to the general rule, the *Jones* court affirmed summary judgment in favor of the corporate successors. *Id.* at 484.

■■ There is no language in the contract between these parties to suggest that Kenwel-Jackson impliedly assumed responsibility for future products liability actions against Kenwel. In fact, the purchase agreement expressly conditioned the sale of assets upon Kenwel's promise to discharge, or to provide for, all of its current or long-term liabilities incurred or unsatisfied as of the date of closing.

■■ Hamaker asserts that the transaction between Kenwel-Jackson and its predecessor amounted to a "merger" of the two corporations, or that Kenwel-Jackson is a "mere continuation" of Kenwel; i.e., exceptions (2) and (3) to the general rule above. However, a merger involves the actual absorption of one corporation into another, with the former losing its existence as a separate corporate entity. When the seller corporation retains its existence while parting with its assets, a "de facto merger" may be found if the consideration given by the purchaser corporation is shares of its own stock. *Leannais,* 565 F.2d at 439, quoting *Bazan v. Kux Machine Co.,* 358 F.Supp. 1250 (E.D.Wis.1973). No stock in Kenwel-Jackson was transferred as consideration for Kenwel's assets. *Cf. Knapp v. North American Rockwell Corp.,* 506 F.2d 361 (3d Cir.1964) *cert. den.* 421 U.S. 965, 95 S.Ct. 1955, 44 L.Ed.2d 452 (1975) [Court found a merger despite manufacturer's continued existence for approximately 18 months after the sale, *where manufacturer's assets had been exchanged for Rockwell Stock.* (Emphasis added.)].

■■ The key element of a "continuation" is a commonality of the officers, directors, and stockholders in the predecessor and successor corporations. *Leannais,* 565 F.2d at 440. The top management personnel of Kenwel was not carried over to Kenwel-Jackson. Nor did any shareholder of either corporation become an owner, shareholder, director, officer, or employee of the other.

In *Turner v. Bituminous Casualty Co.,* 397 Mich. 406, 244 N.W.2d 873 (1976), the Michigan Supreme Court deviated from the traditional requirement for a de facto merger by refusing to recognize a distinction between the purchase of assets with cash and the purchase of assets with the stock of the purchasing corporation. *Id.*

244 N.W.2d at 879–880. In *Turner*, the court held that cash consideration was sufficient to establish a prima facie case of continuation of a successor corporation's responsibility for products liability if:

(1) There was basic continuity of the enterprise of the seller corporation, including, apparently, a retention of key personnel, assets, general business operations, and the corporate name.

(2) The seller corporation ceased ordinary business operations, liquidated, and dissolved soon after distribution of consideration received from the buying corporation.

(3) The purchasing corporation assumed those liabilities and obligations of the seller ordinarily necessary for the continuation of the normal business operations of the seller corporation.

(4) The purchasing corporation held itself out to the world as the effective continuation of the seller corporation.

*Id.* 244 N.W.2d at 883–884.

Many of the factors relied upon in *Turner* exist here.

The transfer included most of the assets, the business "good will", pending orders for the replacement model 3072A notching machine and the name "Kenwel" or any derivative thereof.

The name was changed simply from Kenwel Machine Company, Inc. to Kenwel-Jackson Machine, Inc. The name "Kenwel" was used because the name was known as a machinery manufacturer.

Kenwel-Jackson Machine, Inc., used the same business premises and the same tools and equipment to manufacture the same products as Kenwel Machine Company, Inc.

Kenwel-Jackson started with a work force of only three individuals, all three were previously employed as craftsmen by Kenwel. One later became vice-president in charge of manufacturing of Kenwel-Jackson and stayed in the employ of Kenwel-Jackson until operations ceased in 1984.

However, we are not persuaded to follow *Turner* in this case where none of the owners, officers or stockholders were the same, where Kenwel-Jackson expressly contracted not to assume any of Kenwel's liabilities, where Kenwel-Jackson's business developed in a different direction relative to product line and customers and especially where the notcher in question was neither designed, manufactured nor sold by the successor corporation. We find, therefore, that Kenwel-Jackson's cash purchase of Kenwel's assets does not fall within the "merger" or "continuation" exceptions to the general rule.

The fact that Hamaker's accident occurred some six years after the sale disposes of any suggestion that Kenwel-Jackson and its predecessor entered into the transaction fraudulently to escape liability. Accordingly, we hold that Kenwel-Jackson is not liable for Hamaker's injuries under any of the exceptions to the general rule in relation to successor corporate purchasers.

### *Product Line Liability*

The general rule of corporate nonliability was developed to protect a bona fide purchaser from the unassumed debt liability of its predecessor. L. Frumer & M. Friedman, 1 *Products Liability* § 5.06 (1983). However, the traditional approach has recently been attacked by a minority of jurisdictions within the context of products liability actions. *See: Downtowner, Inc.*, 347 N.W.2d at 121. Advocates of the minority view justify the abandonment of traditional corporate analysis based on its unresponsiveness to the products liability plaintiff who seeks to place the risk of defective products on the marketing enterprise which manufactured and sold them. *See: Jones*, 320 N.W.2d at 484. Hamaker argues that Kenwel-Jackson is liable for her injuries under the "product line" theory which was created by the California Supreme Court in *Ray v. Alad Corp.*, 19 Cal.3d 22, 136 Cal. Rptr. 574, 560 P.2d 3 (1977), and is applica-

ble only to tort liability for a defective product.

In *Ray,* the plaintiff sued Alad Corporation for injuries allegedly caused by a defective ladder which was manufactured by Alad's predecessor in 1952. Alad purchased the assets of its predecessor in 1968, and retained the same plant, employees, equipment, trade name, customers, and sales force. However, the purchase agreement was silent as to whether Alad would assume responsibility for any potentially defective ladders manufactured prior to the transfer of assets in 1968. Failing to find a basis for liability under the traditional exceptions referenced above, the court relied on public policy considerations to impose strict tort liability upon Alad, "to insure that the costs of injuries ... are borne by the manufacturers that put such products on the market rather than the injured persons who are powerless to protect themselves." *Id.* 136 Cal.Rptr. at 579, 560 P.2d at 8, quoting from *Greenman v. Yuba Power Products, Inc.,* 59 Cal.2d 57, 63, 27 Cal.Rptr. 697, 701, 377 P.2d 897, 901 (1963).

The New Jersey Supreme Court reached a similar conclusion in *Ramirez v. Amsted Industries, Inc.,* 86 N.J. 332, 431 A.2d 811 (1981).

In *Jones, supra,* the court rejected the holdings in the *Ray, Ramirez,* and *Turner* cases and noted that they provided no persuasive justification for a departure from the traditional rule of corporate nonliability. *Jones,* 320 N.W.2d at 484. *Accord: Downtowner, Inc.,* 347 N.W.2d at 118; *Leannais,* 565 F.2d at 441. Furthermore, the *Jones* opinion found that the public policy considerations which underlie the imposition of strict liability do not necessarily apply equally to successor corporations. The court stated:

> [T]he corporate assets purchaser, as a successor of the manufacturer of a defective product, cannot be said to have created the risk of a product manufactured by its predecessor, and, except in a very remote way, does not realize the profit for the sale of a predecessor's product.

*Jones,* 320 N.W.2d at 484.

■ Here, Kenwel-Jackson did not acquire the patent for the model 3072 notcher when it purchased the assets of Kenwel. Moreover, Kenwel-Jackson never participated in the design, manufacture, distribution, or chain of sale of the model 3072 notcher. It is true that Kenwel-Jackson continued to manufacture the model 3072A, and subsequently, models 3072B and 3072C until the cessation of its business in 1984. However, Kenwel had already modified the model 3072 notcher by several design changes which resulted in the model 3072A, whose patent was sold to Kenwel-Jackson. Therefore, we find under the facts of this case that Kenwel-Jackson neither invited use of its predecessor's model 3072 notcher, nor represented to the public at large, and Hamaker in particular, that the notcher was safe and suitable for use. *See: Jones,* 320 N.W.2d at 484.

We are further persuaded by the reasoning of the North Dakota Supreme Court in *Downtowner, Inc., supra.* The purchaser of an allegedly defective heating unit brought a products liability action against Acrometal as the corporate successor to the manufacturer of the unit. *Id.* 347 N.W.2d 118. Finding no basis for liability under the exceptions to the traditional rule, and remaining unconvinced by the minority viewpoints, the court held that Acrometal was not liable to the purchaser on a products liability theory for merely continuing its predecessor's product line. *Id.* at 124–125.*

The *Downtowner, Inc.,* court reasoned that North Dakota's adoption of the rule of strict liability in tort precluded it from holding the successor corporation strictly liable

---

\* Acrometal was denied summary judgment in *Downtowner, Inc.,* due to questions of fact in relation to its duty to warn of defects in the predecessor's products. However, no questions concerning duty to warn are presented here.

for damage to the plaintiff's property where Acrometal neither manufactured the allegedly defective product, nor placed it in the stream of commerce. *Id.* at 123. The court stated in part:

> Were we to impose liability on Acrometal in this circumstance it would be liability without duty; thereby removing strict liability from the realm of tort. This we refuse to do. If Acrometal is to be held liable, it must be because Weather-Rite's potential liabilities were assumed with the purchase of assets. Such a finding would require a significant change in corporate law. We would have to hold that the policies of strict liability justify a finding that, though a corporation has dissolved, potential liability should not dissolve with it and that a purchaser of the assets of the dissolved corporation should assume that liability.

*Id.*

South Dakota adopted the rule of strict liability in tort as expressed in § 402A, 2 *Restatement of Torts* 2d, in *Engberg v. Ford Motor Co.*, 87 S.D. 196, 205 N.W.2d 104 (1973) and stated that § 402A is designed to protect the public and insure that damages resulting from defective products are borne by those who market the product. *Id.* 87 S.D. at 205, 205 N.W.2d at 109. Here, Kenwel-Jackson never marketed the model 3072 notcher. Accordingly, we agree with the analysis set forth in *Downtowner, Inc.*, and similarly find that were we to impose liability upon Kenwel-Jackson under the present facts, it would be liability without duty which cannot be reconciled with our adoption of the rule of strict liability in tort. *See: Engberg, supra.*

Therefore, we hold that Kenwel-Jackson is not liable for Hamaker's injuries under any of the exceptions to the general rule of successor corporate nonliability, nor under the "product line" theory applicable to strict liability in tort. Accordingly, summary judgment is affirmed.

All the Justices concur.