**Brenda WHITE, Plaintiff,**

v.

**CONE–BLANCHARD CORPORATION and Park Corporation, Defendants.**

**No. CIV.A. 9:99–CV–248.**

United States District Court, E.D. Texas, Beaumont Division.

May 21, 2002.

768

John Michael Love, Love, Yusaf, Anderson & Burge, Lufkin, TX, for plaintiff.

Robert Follard, Christopher C. Koehler, Don Screen, Kip Bollin, Thompson, Hine & Flory, Cleveland, OH, James M. Harris, Jr., Harris, Lively & Duesler, Beaumont, TX, for defendants.

## MEMORANDUM OPINION

COBB, District Judge.

Before the court is Defendants' Motion for Summary Judgment [Dkt. # 38], and the court having reviewed the motion and responses on file and having conducted an oral hearing on the matter is of the opinion that the motion be GRANTED. This case arises out of an event that occurred in Lufkin, TX on August 18, 1997. On this date, the plaintiff contends she suffered severe injury caused by a defect in the machine she operated at her employer's factory. Subsequently, the plaintiff filed suit in Texas state court against the defendants bringing product liability and failure to warn claims. The defendants argue that because they did not design, manufacture, or sell the machine that allegedly caused the plaintiff's injury, the plaintiff has sued the wrong parties. The defendants also contend that the plaintiff's product liability claims are barred by Texas's Statute of Repose.

### Summary Judgment Standard

A court should grant summary judgment when "there is no genuine issue as to any material fact and [ ] the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is material if it might affect the outcome of a case under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue exists when, in the context of the entire record, a reasonable fact-finder could return a verdict for the non-movant. *Lujan v. National Wildlife Federation*, 497 U.S. 871, 885–86, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). The court must view the evidence introduced and all factual inferences from the evidence in the light most favorable to the party opposing summary judgment. *East-*

*man Kodak v. Image Technical Services*, 504 U.S. 451, 478, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992); *Lemelle v. Universal Mfg. Corp.*, 18 F.3d 1268, 1272 (5th Cir. 1994). However, this favorable presumption for the non-movant exists only when the non-movant presents an actual controversy of fact. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994).

### Background

Neither party disputes the underlying facts surrounding this product liability suit. Since the 1950s, the "Cone" name has been associated with several different business entities. From 1972 to 1997, the Cone–Blanchard Machine Company (CBMC) manufactured the Cone brand of machines, including the Cone–Blanchard Model 11–20 grinding machine, the machine involved in this action. In May of 1997, CBMC went through an involuntary bankruptcy proceeding and on June 24, 1997, the U.S. Bankruptcy Court for the District of Vermont held a court-supervised competitive bid for CBMC's assets. During the bid, Judge Conrad approved the sale of certain assets to Park Corporation. While Judge Conrad named Park as the buyer, in actuality, Blanchard–Windsor Corp., a subsidiary of Park, took possession of the purchased assets. Not all of CBMC's assets were purchased in this sale. After this purchase, Blanchard–Windsor changed its name to Cone–Blanchard Corporation (CBC). For purposes of this memorandum, Park and CBC will be considered one company and will be referred to as CBC.

Shortly after the sale of assets to CBC, on August 18, 1997, the plaintiff, Brenda White, claims she suffered injury while operating a Cone–Blanchard Model 11–20 grinding machine at Lufkin Industries, her employer. According to records, CBMC delivered this machine to Lufkin Indus-

tries on July 18, 1981. While now defunct, at the time White filed this suit, CBMC still existed.

White sued CBC in state court raising product liability claims and a claim for breach of a duty to warn. CBC removed the case to federal court. In December of 1999, CBC moved for summary judgment. The court denied this motion pending completion of discovery on the issue of successor liability. CBC responded to White's discovery requests in January of 2001 and filed this motion for summary judgment in November of 2001 after not receiving any additional discovery requests.

### Successor Liability

CBC argues that White has sued the wrong party because it did not design, manufacture, or sell the grinder that allegedly caused the plaintiff's injury. The grinder was sold in 1981 to Lufkin Industries by CBMC, a company whose assets CBC purchased out of a court-supervised bankruptcy sale in 1997. White argues that CBC is a proper party because the circumstances surrounding its asset purchase from CBMC draped it with successor liability with regard to this machine. CBC strenuously denies such liability exists. The parties also disagree as to whether Texas or Vermont law governs the issue of whether successor liability exists.

### Texas or Vermont Successor Liability Law?

CBC argues that because Texas has adopted the "most significant relationship" test to determine the choice of law in tort cases, the court should apply Texas law to this case. *Gutierrez v. Collins*, 583 S.W.2d 312, 318–319 (Tex.1979). While White acknowledges this might be true for the underlying product liability tort action, she argues that the court must apply the most significant relationship test for each issue and that for the issue of successor liability,

Vermont has the most significant relationship. In support of her argument, White cites *Webb v. Rodgers Machinery Mfg. Co.*, 750 F.2d 368 (5th Cir.1985). Thus, White contends Vermont law should be used to determine whether a successor corporation can be held liable at all, and then if it can be held liable, Texas tort law should be applied to determine the underlying tort liability. The court agrees with the plaintiff on this point.

In *Webb*, the Fifth Circuit reviewed a district court's decision to apply California law, rather than Texas law to the issue of successor liability. *Id.* at 374. The Fifth Circuit held that the district court did not err in applying California law to this issue. *Id.* In *Webb*, the plaintiff suffered injury while at work from a machine manufactured by a proprietorship that later sold its production equipment to the defendant. *Id.* The defendant argued that because of the most significant relationship test, Texas law should apply and that under Texas law, it had no liability. The Fifth Circuit acknowledged that although Texas law governs many of the substantive issues of the case, such as the manufacturer's duty, causation, and damages, choice of law considerations must be viewed with respect to the particular issue to be decided. *Id.* The court then stated: "Here, the particular issue to be decided is the liability of a succeeding business entity using the trade name of a previously existing proprietorship." *Id.* The court then found that California had the most significant relationship with respect to the particular issue of whether the succeeding corporation could be held liable. *Id.; see also* RESTATEMENT (SECOND) OF CONFLICTS OF LAW § 145 cmt. d (1971) ("Each issue is to receive separate consideration if it is one which would be resolved differently under the local rule of two or more of the potentially interested states.").

Similarly, in the present case, Texas law may govern the substantive issues of this case, but applying the most significant relationship test to each issue before the court, it would appear that Vermont law should be applied to the issue of successor liability. CBMC was a Vermont corporation with its principal place of business in Windsor, Vermont. The defendant, CBC, is a Delaware corporation with its principal place of business in Windsor, Vermont. The purchase of CBMC's assets occurred in Vermont and all the assets purchased were located in Vermont at the time of purchase. The purchase agreement between the two companies made Vermont law the choice of law that would govern the purchase agreement. Texas, on the other hand, would appear to have little, if anything, to do with the sale of assets from CBMC to CBC. As such, this court finds Vermont has the most significant relationship to the issue of succession.

CBC cites several Texas state cases that addressed successor liability and applied Texas law both with regard to the issue of successor liability and to general tort liability without regard to the location of the assets purchased by the succeeding corporation. *See Holden v. Capri Lighting Inc.*, 960 S.W.2d 831 (Tex.App.-Amarillo 1997); *Mudgett v. Paxson Machine Co.*, 709 S.W.2d 755 (Tex.App.-Corpus Christi 1986); and *Suarez v. Sherman Gin Co.*, 697 S.W.2d 17 (Tex.App.-Dallas 1985). While the defendants correctly point out that these three cases apply Texas successor liability law, both *Mudgett* and *Suarez* do so without even discussing choice of law and *Holden* expressly states that because the court can dispose of the case on other grounds, it will not address the choice of law issue.

While Texas courts have addressed successor liability without discussing the conflicts of law issue, the Fifth Circuit's holding in *Webb* requires the court to perform a separate conflicts of law analysis for each issue, and in doing so, this court holds Vermont law applies to the issue of successor liability. As such, Vermont law will be used to determine whether a successor corporation can be held liable, and then Texas law will be applied for the underlying tort, if it is determined successor liability exists.

### Successor Liability under Vermont Law

The Supreme Court of Vermont announced its rule on successor liability in *Ostrowski v. Hydra–Tool Corp.*, 144 Vt. 305, 479 A.2d 126, 127 (1984), when it stated:

> The general and traditional rules of corporate successor liability are grounded in corporate law and turn on the form of the change in the corporate entity. The essence of the rule is that the liabilities of a predecessor corporation will pass to the successor only when the change is occasioned by statutory merger or consolidation. 1 L. Frumer & M. Friedman, Products Liability § 5.06[2] (1983). If the change is accomplished by a sale of assets only, the purchasing corporation assumes no liabilities of the seller unless one of the following exceptions applies: (1) the buyer expressly or impliedly agrees to assume such liabilities; (2) the transaction amounts to de facto merger or consolidation; (3) the purchasing corporation is merely a continuation of the selling corporation; (4) the sale is a fraudulent transaction intended to avoid debts and liabilities; (5) inadequate consideration was given for the sale.

*Id.; see also* Douglas R. Richmond, *Product Liability: Corporate Successors and the Duty to Warn*, 45 Baylor L. Rev. 535, 555 & n. 132 (1993) (stating that the gener-

al rule is that a corporation who purchases assets from another company does not assume liability and listing cases to that affect).

In this case, the transaction was accomplished by a sale of assets, and as such, CBC assumes liability under Vermont law only if one of the exceptions applies. Here, White has not argued, nor is there any evidence that exceptions # 1, # 4, or # 5 apply, but White does claim that exceptions # 2 and # 3, namely de facto merger and continuation of the selling corporation, apply.

■ Another court has stated, and this court agrees, that "[i]t is axiomatic that to establish corporate successor liability there must in fact be a corporate successor." *Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.*, 879 F.Supp. 407, 410 (D.Vt.1995). In this regard, it is important to note that until approximately June, 2001, CBMC still existed. Thus, for the court to find that CBC was a successor corporation of CBMC, it would have to find that both the successor and its predecessor existed simultaneously for a period of roughly four years. Such a ruling would seem to strain the definition of successor. *See* Webster's Third New International Dictionary 2282 (1993) (defining successor as "one that follows"); Black's Law Dictionary 1431 (6th ed.1990) (defining successor as "One that succeeds or follows; one who takes the place that another has left, and sustains the like part or character; one who takes the place of another by succession.").

■ Turning to the exceptions to the general rule, "[c]ourts are generally reluctant to deem an asset purchase a *de facto* merger." Richmond, *supra* at 563. The Vermont Supreme Court has not explicitly defined de facto merger, but has cited a New Jersey decision that listed factors for determining when a de facto merger oc-

curs and establishes successor liability. *Cab–Tek, Inc. v. E.B.M., Inc.*, 153 Vt. 432, 571 A.2d 671, 672 (1990). As enunciated by the New Jersey court, de facto merger factors include: 1) transfer or sale of all assets; 2) exchange of stocks; 3) change of ownership, whereby stockholder, officers, and creditors go to the surviving corporation; and 4) assumption of a variety of liabilities pursuant to previously negotiated agreements. *Wilson v. Fare Well Corp.*, 140 N.J.Super. 476, 356 A.2d 458, 464 (1976); *see also Union Sav. Bank v. Augie/Restivo Baking Co., Ltd.*, 860 F.2d 515, 519–20 (2nd Cir.1988) (analyzing de facto merger for purposes of successor liability under New York law and stating that to "find that a de facto merger has occurred there must be a continuity of the selling corporation, evidenced by the same management, personnel, assets and physical location; *a continuity of stockholders, accomplished by paying for the acquired corporation with shares of stock; a dissolution of the selling corporation,* and the assumption of liabilities by the purchaser.") (emphasis added). "Courts generally afford the second of these elements, i.e., shareholder continuity or a transfer of stock as consideration, special importance." Richmond, *supra* at 558; *see also Travis v. Harris Corp.*, 565 F.2d 443, 447 (7th Cir.1977) (stating that the key to finding a de facto merger was the existence of a transfer of stock).

The Vermont Supreme Court stated that consolidation has "a specific and unique meaning within the context of corporate law" and "occurs when the 'combining corporations are dissolved and lose their identity in a new corporate entity.'" *Cab–Tek, Inc. v. E.B.M., Inc.*, 153 Vt. 432, 571 A.2d 671, 672 (1990) (quoting *Leannais v. Cincinnati, Inc.*, 565 F.2d 437, 440 (7th Cir. 1977)).

"As a rule, courts narrowly construe the mere continuation exception." Richmond, *supra* at 564. Vermont has never explicitly defined what constitutes a mere continuation, but the Second Circuit, in a case applying New York law, recently stated that successor liability under the mere continuation theory "attaches when the plaintiff demonstrates 'the existence of a single corporation after the transfer of assets, with an identity of stock, stockholders, and directors between the successor and predecessor corporations.'" *Graham v. James*, 144 F.3d 229, 240 (2nd Cir.1998) (quoting *B.F. Goodrich v. Betkoski*, 99 F.3d 505, 519 (2nd Cir.1996)). The crucial inquiry in deciding whether the mere continuation exception applies is deciding whether there is a continuation of the seller's corporate entity, not whether there is a continuation of the seller's business operation. 1 FRUMER & FRIEDMAN, PRODUCTS LIABILITY § 206[2][c] (1983). "Absent continuity of corporate ownership, the mere continuation exception is inapplicable." Richmond, *supra* at 564.

In the present case, the undisputed facts show that CBC did not purchase all of CBMC's assets. They further show that CBC did not pay for the assets with its own stock, nor was any stock exchanged between the two companies. The undisputed facts also show that none of CBMC's shareholders or directors became shareholders or directors of CBC. Finally, the undisputed facts show that the selling company did not dissolve upon the sale of assets to the purchasing company, but rather, as discussed above, CBMC remained in existence for approximately four years after the sale of the assets to CBC.

■ CBC simply purchased some of CBMC's assets in a court-supervised bankruptcy sale. This sale involved two diverse companies-both before and after the sale. White has failed to provide the court with any evidence that tends to show a continuity of corporate ownership. At most, White's evidence demonstrates CBC purchased assets from CBMC and then operated in the same business-line as CBMC formerly operated in. Such a showing is insufficient to establish successor liability.

Furthermore, this court is concerned with the public policy implications of imposing the bankrupt company's liabilities on a company willing to purchase its assets at a court-supervised bankruptcy sale. "[A]t its core, bankruptcy law historically was, and presently is, a debt collection system." 1 DAVID G. EPSTEIN, ET AL., BANKRUPTCY § 1–2 (1992). To impose liability on the purchasing company merely for buying assets and then using them in the same manner as the selling company did, could greatly reduce the value of these assets, and thus have a potentially major impact on the effectiveness of this debt collection system.

Finally, the Vermont Supreme Court's rejection of the product-line theory, which imposes liability on a successor corporation that continues to manufacture a product of a business it acquires, regardless of the method of acquisition, is in accord with this court's ruling. In rejecting this theory, the Vermont court stated:

Broadly stated, the rationale of these decisions [cases accepting the product-line theory], as well as the continuity of enterprise theory, appears to turn on a balancing of economic considerations: perceived benefits to the successor resulting from acquisition, and the assumption that the successor is better able to bear the cost of harm regardless of fault, than the injured person. The postulate seems to be that these costs can always be passed on to consumers in the form of price increases.

We agree with the position taken by the lower court that these theories do not speak the law of this state, and we decline to adopt them. *In our view, the arguments in support of the general rule are more persuasive: the successor corporation did not create the risk or receive any benefit from the proceeds of the sale; it did not invite or solicit its use or make any representations as to its safety; it is in no position to enhance the safety of a product already on the market, and finally, we view the theories urged by plaintiff as a potential economic threat to small businesses. See, e.g., Bernard v. Kee Manufacturing Co.,* 409 So.2d 1047 (Fla.1982). Accordingly, we hold that the general and more traditional rule, including the exceptions described above, is the law in this state, and the court properly dismissed the first two counts.

*Ostrowski,* 479 A.2d at 127 (emphasis added); *accord* Richmond, *supra* at 569–70 ("On a philosophical level, the product line theory washes away the requirement of a causal relationship between the defendant's conduct and a plaintiff's injury.... The product line theory gives judicial legitimacy to the perpetual plaintiff's search for some manufacturer's or insurer's 'deep pockets.' ").[1] The explicit rejection of the product-line theory by the Vermont Supreme Court demonstrates the importance of the continuity of ownership factor in determining successor liability under Vermont law. The product-line theory imposes liability on a successor corporation without regard to continuity of ownership, *see generally Ray v. Alad Corp.,* 19 Cal.3d 22, 136 Cal.Rptr. 574, 560 P.2d 3 (Cal.1977), whereas the traditional exceptions of de facto merger, consolidation, and continuation all require a continuity of ownership. In this case, White has completely failed to provide the court with any evidence that tends to show a continuity of ownership. The Vermont Supreme Court in its discussion of the product-line theory seemed unwilling to impose liability on the plaintiff in that case merely for buying assets and continuing to make the same product as the selling corporation, yet this is exactly what White argues this court should allow her to do.

It may appear unsympathetic for the court to not allow White to bring her product liability cause of action against CBC as the successor to CBMC which is now defunct. The fact remains, however, that CBMC existed for almost four years after White's injury and for almost two years after White commenced this suit against CBC. During all that time, White could have filed suit against the company that designed, manufactured, and sold the machine she contends caused her injury.

---

1. When the California Supreme Court created the product-line exception to the general rule of successor liability, one of the court's main justifications for doing so, and therefore, one of the exception's elements, was that the sale and dissolution of the old company destroyed the plaintiff's remedies against the original manufacturer, thus leaving the plaintiff with no remedy against the original manufacturer and because of the general rule, no remedy against its successor. *See Ray v. Alad Corp.,* 19 Cal.3d 22, 136 Cal.Rptr. 574, 560 P.2d 3, 8–9 (1977). This justification does not apply in this case because CBMC did not dissolve after the asset sale, but remained in existence for approximately four years after the sale and two years after White filed suit against CBC. The California Supreme Court also justified the creation of the product-line exception on the fact that the successor caused the dissolution of the original manufacturer. *Id.* at 9. Circuit courts have held that when a successor buys its predecessor's assets in a bankruptcy sale, the product-line exception does not apply because under such circumstances, bankruptcy, not the successor caused the dissolution. *Conway v. White Trucks,* 885 F.2d 90, 97 (3rd Cir.1989); *Nelson v. Tiffany Indus., Inc.,* 778 F.2d 533, 538 (9th Cir.1985).

For whatever reason though, she chose not to file suit against CBMC.

Based on these undisputed facts, the court cannot find that any of the exceptions to the general rule that the purchaser of assets does not assume successor liability.

### The Texas Statute of Repose

Even if the court were to find CBC possessed successor liability under Vermont law, the Texas Statute of Repose would bar White's product liability suit. Section 16.012 of the TEXAS CIV. PRAC. AND REM. CODE requires a claimant to commence a product liability action against the manufacturer of the product before the end of fifteen years after the date of the sale of the manufacturing equipment, unless the manufacturer expressly represents that the equipment's useful life was longer than fifteen years, and then, in that case, the claimant must bring suit within the represented time period. According to this statute then, there is a general fifteen year rule, but if the manufacturer expressly represents the machinery has a useful life of more than fifteen years, the cut-off point will be extend past fifteen years. In this case, it is undisputed that both the accident and the commencement of the product liability suit occurred more than fifteen years after the date of sale to Lufkin Industries. As such, White can only avoid the statute's bar if the manufacturer expressly represented that the machine's useful life exceeded fifteen years.

■ In their briefs and during oral arguments, CBC has stated that it is unaware of any evidence that CBMC made representations back in 1981 that this machine had a useful life of more than fifteen years. White has not brought forward any evidence, which would contradict these statements by the defendant. Thus, the court is not aware of any evidence that demonstrates the condition extending the cut-off point occurred in this case. As such, White's product liability cause of action is barred by Texas's Statute of Repose.

Accordingly, the court grants CBC's motion for summary judgment with regard to White's product liability claims on the alternative grounds that no successor liability exists under Vermont law and/or that the Texas Statute of Repose bars the suit.

### White's Failure to Warn Claim

■ Successor corporations may have an independent duty to warn that arises regardless of the nature or type of transaction that made the company a successor. FRUMER & FRIEDMAN, *supra* at § 206[5]. The successor company's independent liability flows not from its status as a successor, but rather from its relationship with its predecessor's customers. *Mozingo v. Correct Mfg. Corp.*, 752 F.2d 168, 177 (5th Cir.1985). Succession alone, however, does not impose a duty to warn of recently discovered defects. *Stratton v. Garvey International, Inc.*, 9 Kan.App.2d 254, 676 P.2d 1290, 1294 (1984).

"Courts imposing a duty to warn look to such factors as succession to service contracts, contracted coverage of the subject machine, service of the particular machine by the successor, the successor's knowledge of defects, and the successor's knowledge of the owner or location of the particular machine." Richmond, *supra* at 571. The Fifth Circuit listed the following factors as relevant to determining whether there is a continuity of a relationship: 1) whether the successor takes over the service contracts of the predecessor; 2) whether the successor knows of defects in the equipment; and 3) whether the successor knows of the location of the equipment. *Mozingo*, 752 F.2d at 177. Generally speaking, "[a]bsent specific service obligations, courts are reluctant to impose or

suggest a duty to warn. The fact that a successor services its predecessor's product, simply because a consumer so requests, without more, will probably not give rise to a duty." Richmond, *supra* at 575.

In the present case, no evidence has been provided to the court that demonstrates CBC assumed the service contracts entered into by CBMC and its customers, or, even, that such contracts existed. No evidence has been provided to the court that shows CBC sought repair work from CBMC's customers. No evidence has been provided to the court that demonstrates CBC performed any repair work on this particular grinder prior to the date of the alleged accident. Finally, no evidence has been provided to the court that shows CBC possessed knowledge of a defect in the grinder.

■ White argues that CBC could have had knowledge of a defect in the grinder: "*if* Defendants' predecessor had knowledge of the defect in the grinder, that knowledge could only exist in the predecessor's documentation, and in the minds of the Cone–Blanchard employees [all of which CBC now controlled]." *Plaintiff's Response and Memorandum in Opposition to Defendants' Motion for Summary Judgment* at 15 (emphasis added). White's burden is to present some evidence that CBC *actually* had knowledge of a defect, not that they could have had such knowledge. White has failed to come forward with any evidence that CBC knew of a defect in the grinder or that this situation was anything more than a one time malfunction of the product.

Because White has failed to provide any evidence that CBC assumed CBMC's service contracts, performed service on Lufkin Industries' grinder, or knew of a defect in this grinder, the court finds that CBC did not possess an independent duty to warn. Accordingly, the court grants CBC's motion for summary judgment on this issue. It is, therefore,

ORDERED, that Defendants' Motion for Summary Judgment is hereby GRANTED. It is further,

ORDERED, that this case is CLOSED.