J-E01004-25                    2026 PA Super 43

| | | |
|---|---|---|
| DANA BURNLEY AND RALPH BURNLEY, H/W | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| LOEWS HOTEL, PHILADELPHIA HOTEL OPERATING COMPANY, INC., TWELFTH STREET HOTEL ASSOCIATES, AUDIO VISUAL SERVICES GROUP, INC. D/B/A PSAV PRESENTATION SERVICES, LAWALL COMMUNICATIONS, CHECKERS INDUSTRIAL PRODUCTS, CHECKERS SAFETY GROUP, CHECKERS INDUSTRIAL SAFETY PRODUCT, FIREFLY CABLE PROTECTORS, LINEBACKER  CABLE MANAGEMENT AND ASCENDANT VENTURES, INC. | : | No. 370 EDA 2023 |
| | : | |
| v. | : | |
| | : | |
| INDUSTRY ADVANCED TECHNOLOGIES, INC., ASCENDANT VENTURES, INC., FALLINE CORPORATION, FOH PRODUCTIONS, EVAN ANDREWS, EVAN ANDREWS DESIGN AND ALLEN PRICE, PRICE PRODUCTIONS, LLC AND CHRISTOPHER HASSFURTHER | : | |
| | : | |
| APPEAL OF: CHECKERS INDUSTRIAL PRODUCTS, LLC | : | |

Appeal from the Judgment Entered January 10, 2023
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  160901257

| | | |
|---|---|---|
| DANA BURNLEY AND RALPH BURNLEY, H/W | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellants | : | |
| | : | |

J-E01004-25

|  | : |  |
|---|---|---|
| v. | : | |
| | : | |
| LOEWS HOTEL, PHILADELPHIA | : | |
| HOTEL OPERATING COMPANY, INC., | : | |
| TWELFTH STREET HOTEL | : | |
| ASSOCIATES, AUDIO VISUAL | : | No. 485 EDA 2023 |
| SERVICES GROUP, INC. D/B/A PSAV | : | |
| PRESENTATION SERVICES, LAWALL | : | |
| COMMUNICATIONS, CHECKERS | : | |
| INDUSTRIAL PRODUCTS, CHECKERS | : | |
| SAFETY GROUP, CHECKERS | : | |
| INDUSTRIAL SAFETY PRODUCT, | : | |
| FIREFLY CABLE PROTECTORS, | : | |
| LINEBACKER  CABLE MANAGEMENT | : | |
| AND ASCENDANT VENTURES, INC. | : | |
| | : | |
| v. | : | |
| | : | |
| INDUSTRY ADVANCED | : | |
| TECHNOLOGIES, INC., ASCENDANT | : | |
| VENTURES, INC., FALLINE | : | |
| CORPORATION, FOH PRODUCTIONS, | : | |
| EVAN ANDREWS, EVAN ANDREWS | : | |
| DESIGN AND ALLEN PRICE, PRICE | : | |
| PRODUCTIONS, LLC AND | : | |
| CHRISTOPHER HASSFURTHER | : | |

Appeal from the Judgment Entered January 10, 2023
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  160901257

BEFORE:  LAZARUS, P.J., BOWES, J., PANELLA, P.J.E., DUBOW, J.,
McLAUGHLIN, J., KING, J., SULLIVAN, J., BECK, J., and LANE, J.

DISSENTING OPINION BY BOWES, J.:                    **FILED MARCH 5, 2026**

After careful study, I cannot join the Lead Opinion's decision to affirm

the viability of the product line exception to the rule that a company acquiring

the assets of another does not *ipso facto* become burdened with the seller's

liabilities, as was pronounced in ***Dawejko v. Jorgensen Steel Co.***, 434 A.2d

- 2 -

106, 107 (Pa.Super. 1981). I must agree with Judge Beck that Checkers waived for appellate review the issues of whether we should continue to recognize the exception and, if so, whether its applicability is a question for the judge or jury. *See* Concurring Opinion (Beck, J.) at 4-6. Nonetheless, I would vacate the judgment and verdict against Checkers, and hold that the product line exception is unavailable to plaintiffs who, like the Burnleys, fail to establish that the successor company's asset acquisition caused the injured party to be left without a remedy.[1] I also write separately to advocate for the wholesale rejection of the product line exception, by our Supreme Court or this Court *en banc* when the issue is properly presented, for the reasons detailed below.

## I.    A reiteration of the relevant history of this case

I begin by reviewing the basic history of this case. Mrs. Burnley was injured in September 2014 when she tripped on a cable protector device in the ballroom of Loews Hotel in Philadelphia. The apparatus was from the Firefly product line, which was owned by IAT, was manufactured by FallLine from molds supplied by IAT, and was rented by FOH Productions for use at the event in question. In April 2015, IAT and Checkers entered into an asset

---

[1] As I would reverse the judgment against Checkers on this basis, I would not reach the other issues presented in these appeals, including the one addressed by President Judge Lazarus in her concurring and dissenting opinion, namely that a new trial is warranted by the trial court's handling of the admission of evidence of insurance.

purchase agreement ("APA") through which Checkers purchased IAT's cable protector assets. IAT agreed not to dissolve for at least two years nor to compete with Checkers in the cable protection industry. IAT expressly retained all existing liabilities, which included indebtedness of more than $500,000.[2] In exchange, Checkers agreed to pay IAT an initial lump sum of $160,000 followed by a varying percentage of the net sales of Firefly-branded products for five years, *i.e.*, until 2020.

The Burnleys initiated this action shortly before the expiration of the statute of limitations in September 2016. They stated negligence claims against the hotel and related defendants, one of whom later joined FOH Productions as an additional defendant. The Burnleys also pled negligence and strict liability claims against Checkers and other entities. Checkers joined

---

[2] The APA guaranteed that IAT had no known claims or inquiries, or indebtedness other than specified. ***See*** APA, 4/1/15, at ¶¶ 4.8, 4.10. Regarding insurance, the APA provided:

> [IAT] currently has no insurance with respect to its properties, assets and operation of its [cable protector b]usiness, and to the extent of any past or current insurance policy, there are no claims by [IAT] pending under any such policies and [IAT] has not been informed that any coverage has been questioned, denied[,] or disputed by the underwriters of such policies with respect to any such claims.

***Id***. at ¶ 4.12. President Judge Lazarus details how, at trial, the Burnleys introduced this aspect of the APA to suggest that there was no IAT insurance policy from which they could recover, but Checkers was denied a limiting instruction and forbidden from exploring whether IAT subsequently obtained insurance. ***See*** Concurring and Dissenting Opinion (Lazarus, P.J.) at 4-5.

FallLine and IAT, which was still in existence, as additional defendants. IAT was dismissed as a defendant when its preliminary objections to personal jurisdiction were sustained.

After all the joinders and dismissals concluded, the Burnleys were left with six defendants: the hotel and two others accused of negligently creating the condition that caused Mrs. Burley's fall; and three strict liability defendants, namely Checkers, FallLine, and FOH Productions. The Burnleys settled with all but Checkers, which proceeded to trial conceding that the Firefly product in question had a manufacturing defect. Specifically, the combination of the type of molds supplied to FallLine by IAT, and the particular material FallLine poured into them, resulted in misaligned parts that did not fit securely when FallLine assembled them. A total of approximately fifty defective cable protecters were sold, including the one on which Mrs. Burnley tripped due to the defect. While IAT and FallLine knew of the defect before they shipped to FOH Productions the unit that caused Mrs. Burnley's injury, there was no evidence that Checkers was informed of the manufacturing defect before it acquired the Firefly product line from IAT. Nor did Checkers at any point use the molds and material to manufacture any misaligned products.

Checkers defended the case by, *inter alia*, disputing that it was a successor corporation for purposes of the product line exception. However, upon being charged as to the applicable law, the jury concluded that Checkers

was liable under that theory. It proceeded to find that Checkers, FOH Productions, and FallLine were strictly liable for the defective Firefly protector, but assigned 100% of the liability to Checkers and not to any of the settled defendants.

## II.     Principles underlying strict products liability

Prior to delving into the law concerning corporate successor liability, I recap the foundational principles of strict products liability. Products liability claims, like all tort actions, "lie for breaches of duties imposed by law as a matter of social policy." *Tincher v. Omega Flex, Inc*., 104 A.3d 328, 382 (Pa. 2014) (cleaned up). "The duty in strict liability pertains to the duty of a manufacturer and of suppliers in the chain of distribution to the ultimate consumer." *Id*. at 383. In accordance with § 402A of the Restatement (Second) of Torts, "those who sell a product (*i.e.*, profit from making and putting a product in the stream of commerce) are held responsible for damage caused to a consumer by the reasonable use of the product." *Id*. at 382. *See also Roverano v. John Crane, Inc.*, 226 A.3d 526, 542 (Pa. 2020) ("[A] person or entity engaged in the business of selling a product has a duty to make and/or market the product—which is expected to and does reach the user or consumer without substantial change in the condition in which it is sold—free from a defective condition unreasonably dangerous to the consumer or the consumer's property." (cleaned up)).

In § 402A cases, "the tortious conduct at issue is not the same as that found in traditional claims of negligence and commonly associated with the more colloquial notion of 'fault.'" **Id**. (cleaned up). Instead, the duty is based upon a balancing of the interests of the respective parties. As our High Court explained by reference to the comments to § 402A:

> A seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it; that public has a right to and does expect, in the case of products which it needs and for which it is forced to rely upon the seller, that reputable sellers will stand behind their goods; that public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained; and that consumer of such products is entitled to the maximum of protection at the hands of someone, and the proper persons to afford it are those who market the products.

**Tincher**, 104 A.3d at 383 (cleaned up).

That duty extends to "anyone who enters into the business of supplying human beings with products which may endanger the safety of their persons and property," whether that be the designer or manufacturer of the product or an entity that sells or leases the product to the consumer. **See Francioni v. Gibsonia Truck Corp.**, 372 A.2d 736, 738 (Pa. 1977) (cleaned up). In deciding whether any particular entity in the supply chain is liable for the marketing of a defective product, the court considers: (1) "the availability of some entity for redress;" (2) "whether applying strict liability would provide an incentive to safety;" (3) "whether the supplier is in a better position than

the consumer to prevent the circulation of defective products;" and (4) "whether the supplier of the product can distribute the cost of compensating for injuries resulting from defects by spreading the charges therefor." *Cafazzo v. Cent. Med. Health Servs., Inc.*, 668 A.2d 521, 525-27 (Pa. 1995) (holding policy reasons for strict liability were not present to justify imposing liability upon medical service providers for defective prosthetic device).

In sum, it is the policy of Pennsylvania that, among parties that all may have acted reasonably and exercised due care, those that earned profits through the business of placing products into the hands of consumers are most properly shouldered with the cost of any harm caused by defects in those products. In this regard, the law imposes liability without negligence or fault, but not liability in the absence of a recognized legal duty.

## II. Corporate successor liability

### A. The historical rule of non-liability and its well-settled exceptions

Traditionally, "[a]s a general principle of corporation law, a purchaser of a corporation's assets does not, for such reason alone, assume the debts of the selling corporation, unlike a purchaser of the corporation's stock." *Campbell v. WeCare Organics LLC*, 333 A.3d 683, 688 (Pa.Super. 2025) (cleaned up). As such, the liability of any given company for breaching its duty to make or sell a safe product does not pass with the sale of the company's assets. The policy reasons for the general rule are obvious: it

encourages and facilitates investment and asset transfers by eliminating the burden of unanticipated liabilities.

There are a number of generally-accepted variances from the general rule. Our Supreme Court has recognized exceptions where:

> (1) the purchaser expressly or implicitly agreed to assume liability, (2) the transaction amounted to a consolidation or a *de facto* merger, (3) the purchasing corporation was merely a continuation of the selling corporation, (4) the transaction was fraudulently entered into to escape liability, or (5) the transfer was without adequate consideration and no provisions were made for creditors of the selling corporation.

*Fizzano Bros. Concrete Products, Inc. v. XLN, Inc.*, 42 A.3d 951, 954 n.2 (Pa. 2012) (cleaned up). The reasons for holding the successor liable in each of these enumerated circumstances are likewise patent: the general rule is founded upon a *bona fide*, arms-length transaction, not a use of the corporate form or formalities to avoid legitimate debts. *See*, *e.g.*, 15 William Meade Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 7124.10 ("The exception is designed to prevent a situation whereby the specific purpose of acquiring assets is to place those assets out of reach of the predecessor's creditors.").

### B. Creation and application of the product line exception

In the 1970s, a small number of courts in our sister states began enlarging successor liability upon perceiving that "[s]ometimes in cases of strict tort liability the general rule seems to lead to an unjust result."

*Dawejko*, 434 A.2d at 107. The expansion was implemented by various courts through what was in effect a broadening of the third existing exception.

Some directly proceeded under the guise of loosening the definition of a "mere continuation" by jettisoning the requirement that the successor have a common identity of officers, directors, and stock, and looking instead at whether there was a continuity in "nature of the business operations." *Id*. at 108 (citing, *inter alia*, *Andrews v. John E. Smith's Sons Co.*, 369 So.2d 781, 785 (Ala. 1979)). The continuity of enterprise approach is followed in Alabama, Alaska, and Michigan. *See Asher v. KCS Int'l, Inc.*, 659 So. 2d 598, 600 (Ala. 1995); *Savage Arms, Inc. v. W. Auto Supply Co.*, 18 P.3d 49, 58 (Alaska 2001); *Turner v. Bituminous Cas. Co.*, 244 N.W.2d 873, 881-82 (Mich. 1976)).

Other courts adopted a new exception that focused upon whether the successor utilized the acquired assets to continue producing the same product line as the one which caused the injuries in question. The two most notable decisions for purposes of this discussion were *Ray v. Alad Corporation*, 560 P.2d 3 (Cal. 1977), and *Ramirez v. Amsted Industries, Inc.*, 431 A.2d 811 (N.J. 1981).

In *Ray*, the plaintiff sued the successor to a manufacturer of specialty "Alad" ladders for injuries caused by a defective unit. The offending ladder was made by the predecessor company five years after the successor acquired the original Alad Corporation's assets and the original Alad dissolved. As this Court summarized, "the successor corporation continued to manufacture the

predecessor corporation's product line (ladders), using the same equipment and designs, employing the same personnel, and soliciting the predecessor's customers through the same sales representatives, with no outward indication of a change of ownership." *Dawejko*, 434 A.2d at 109. With none of the traditional exceptions to the rule of non-liability applicable to the facts of the case, the *Ray* Court deemed adherence to the general rule to be unjust and contrary to the overriding purpose of strict liability, namely "to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves." *Ray*, 560 P.2d at 8 (cleaned up). Therefore, the California Supreme Court adopted the product line exception, which imposed liability on the successor where three factors were present:

> (1) the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business, (2) the successor's ability to assume the original manufacturer's risk-spreading role, and (3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business.

*Id*. at 9.

The Supreme Court of New Jersey in *Ramirez* recognized the product line exception and "substantially" adopted the test articulated in *Ray*. *See Ramirez*, 431 A.2d at 812. The *Ramirez* plaintiff was injured in 1975 by a Johnson machine punch press that had been manufactured in the late 1940s.

- 11 -

Between the time of the manufacture and the injury, the Johnson company assets, including the manufacturing plant, inventory, equipment, intellectual property, pending contracts, and the exclusive right to use the Johnson trade name, had been sold twice, ultimately to Amsted in 1962. The original Johnson company was dissolved in 1965 with Amsted as the only shareholder.

Upon discerning that none of the usual exceptions to the rule of successor non-liability pertained to the facts of the case, the *Ramirez* Court considered both expansion of mere continuation exception and adoption of the product line exception. It ultimately opted for the latter in accordance with *Ray* and determined that the *Ray* factors precipitated Amsted's liability for its predecessor's press.

In particular, the Court first found that "the plaintiff's potential remedy against Johnson, the original manufacturer of the allegedly defective press, was destroyed by the purchase of the Johnson assets, trade name and good will, and Johnson's resulting dissolution," and "there was continuity in the manufacturing of the Johnson product line throughout the history of these asset acquisitions." *Id*. at 820. Second, because "Amsted acquired the Johnson trade name, physical plant, manufacturing equipment, inventory, records of manufacturing designs, patents and customer lists" and it "also sought the continued employment of the factory personnel that had manufactured the Johnson presses" for both its predecessors, "Amsted had virtually the same capacity as Johnson to estimate the risks of claims for

injuries from defects in previously manufactured presses for purposes of obtaining liability insurance coverage or planning self-insurance." *Id*. at 821-22 (cleaned up). Finally, by acquiring all the assets of the Johnson product line, "and by holding itself out to potential customers as the manufacturer of the same line of Johnson power presses, Amsted benefited substantially from the legitimate exploitation of the accumulated good will earned by the Johnson product line." *Id*. at 822.

Although the *Ramirez* Court founded its ruling on the three elements outlined in *Ray*, it stated New Jersey's product line exception as follows:

> where one corporation acquires all or substantially all the manufacturing assets of another corporation, even if exclusively for cash, and undertakes essentially the same manufacturing operation as the selling corporation, the purchasing corporation is strictly liable for injuries caused by defects in units of the same product line, even if previously manufactured and distributed by the selling corporation or its predecessor.

*Ramirez*, 431 A.2d at 825.

In addition to California and New Jersey, appellate courts in Mississippi, New Mexico, and Washington have adopted the product line exception. *See Huff v. Shopsmith, Inc.*, 786 So. 2d 383, 388 (Miss. 2001); *Garcia v. Coe Mfg. Co.*, 933 P.2d 243, 248-50 (N.M. 1997); *Martin v. Abbott Labs.*, 689 P.2d 368, 388 (Wash. 1984).

Thus, courts adopting the product line exception to the rule of successor non-liability focused upon the policy underlying strict liability concerning "the protection of otherwise defenseless victims of manufacturing defects and the

spreading throughout society of the cost of compensating them." ***Ray***, 560 at 8 (cleaned up). ***See also Ramirez***, 431 A.2d at 823 (citing "the basic social policy, now so well-entrenched in our jurisprudence, that favors imposition of the costs of injuries from defective products on the manufacturing enterprise and consuming public rather than on the innocent injured party"). Although the successor breached no duty and played no part in contributing to the consumer's injury, "the successor is positioned to assess the risks before purchasing the assets, and to then decide whether to assume the potential burden associated with its acceptance of the predecessor's goodwill by continuing to produce the same product line." ***Garcia***, 933 P.2d at 249. For these reasons, the courts adopting the exception deemed it fair to impose liability on the successor when that company played a significant role in causing the plaintiff's inability to recover.

**C.      The argument for rejecting the product line exception and adhering to the Lead Opinion view**

The deliberate erosion of the general rule that liability does not follow assets, be it by more liberal application of the mere continuation exception to impose liability where there is a continuity of enterprise, or by recognition of the distinct product line exception, remains the minority view. It has been rejected by appellate courts in favor of retaining only the traditional exceptions in Arizona, Colorado, Florida, Illinois, Indiana, Iowa, Kentucky, Maryland, Massachusetts, Minnesota, Missouri, Nebraska, New Hampshire, New York,

North Dakota, Ohio, South Dakota, Texas, Utah, Vermont, Virginia, and Wisconsin.[3]

Our sister states have offered sundry reasons for declining to embrace the new exception. Primarily, courts observed that the product line exception is inconsistent with the foundational premise of strict liability, namely that responsibility for injuries caused to innocent consumers by defective products rests with the entities who breached their duty to place on the market products that are safe for their intended use. **See Tincher**, 104 A.3d at 383 ("A seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public

---

[3] **See Winsor v. Glasswerks PHX, L.L.C**., 63 P.3d 1040, 1049 (Ariz. Ct. App. 2003); **Johnston v. Amsted Indus., Inc**., 830 P.2d 1141, 1144 (Colo. App. 1992); **Bernard v. Kee Mfg. Co., Inc**., 409 So.2d 1047, 1050–51 (Fla. 1982); **Domine v. Fulton Iron Works**, 76 Ill.App.3d 253, 257, 395 N.E.2d 19, 23 (Ill. App. Ct. 1979); **Guerrero v. Allison Engine Co**., 725 N.E.2d 479, 487 (Ind. Ct. App. 2000); **DeLapp v. Xtraman, Inc**., 417 N.W.2d 219, 222–23 (Iowa 1987); **Pearson ex rel. Trent v. Nat'l Feeding Sys., Inc**., 90 S.W.3d 46, 52 (Ky. 2002); **Nissen Corp. v. Miller**, 594 A.2d 564, 573 (Md. 1991); **Guzman v. MRM**/**Elgin**, 567 N.E.2d 929, 931 (Mass. 1991); **Niccum v. Hydra Tool Corp**., 438 N.W.2d 96, 99–100 (Minn. 1989); **Young v. Fulton Iron Works Co.**, 709 S.W.2d 927, 940 (Mo. Ct. App. 1986); **Jones v. Johnson Mach. & Press Co. of Elkhart, Ind**., 320 N.W.2d 481, 484 (Neb. 1982); **Simoneau v. S. Bend Lathe, Inc**., 543 A.2d 407, 409 (N.H. 1988); **Semenetz v. Sherling & Walden, Inc.**, 851 N.E.2d 1170 (N.Y. 2006); **Downtowner, Inc. v. Acrometal Products, Inc**., 347 N.W.2d 118, 124–25 (N.D. 1984); **Pilkington N. Am., Inc. v. Travelers Cas. & Sur. Co**., 861 N.E.2d 121, 130 (Ohio 2006); **Hamaker v. Kenwel-Jackson Mach., Inc.**, 387 N.W.2d 515, 521 (S.D. 1986); **Griggs v. Capitol Mach. Works, Inc.**, 690 S.W.2d 287, 292–93 (Tex. App. 1985); **Tabor v. Metal Ware Corp**., 168 P.3d 814, 817 (Utah 2007); **Ostrowski v. Hydra-Tool Corp**., 479 A.2d 126, 127 (Vt. 1984); **Harris v. T.I., Inc**., 413 S.E.2d 605, 609–10 (Va. 1992); **Fish v. Amsted Indus., Inc.**, 376 N.W.2d 820 (Wis. 1985).

who may be injured by it; . . . that public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them[.]" (cleaned up)).

These courts opine that the argument that successor liability furthers the goal of protecting defenseless consumers "overly simplifies the underlying principles of strict liability." *Guzman v. MRM/Elgin*, 567 N.E.2d 929, 932 (Mass. 1991). "Strict liability is not a no-fault system of compensation. Rather, its goal is to place responsibility for a defective product on the manufacturer who placed that product into commerce." *Id*. (cleaned up). *See also Domine v. Fulton Iron Works*, 395 N.E.2d 19, 23 (Ill. App. Ct. 1979) ("The cornerstone of strict liability rests upon the defendant's active participation in placing the allegedly defective product into commerce[.]"). This duty is tied to the fact that the company that put the defective product on the market profited from its sale to consumers. *See Tincher*, 104 A.3d at 382 ("[T]hose who sell a product (*i.e.*, **profit from** making and putting a product in the stream of commerce) are held responsible for damage caused to a consumer by the reasonable use of the product." (emphasis added)).

Yet the product line exception consigns accountability for a defective product upon an entity that did not create or otherwise contribute any risk of harm from the product, did not represent that the product was safe, did not solicit use of the product, and never had the ability to eliminate the risk by increasing the safety of the product. *See Johnston v. Amsted Indus., Inc.*,

830 P.2d 1141, 1144 (Colo. App. 1992) (collecting cases). As such, the

exception punishes a company that did not have, let alone breach, any duty

vis-à-vis the product and consumer in question. As one Court explained:

> Most emphatically, then, the rationale of the product line theory—
> that it serves to advance the social policies underlying strict
> products liability—assuredly cannot find a juridical basis in the
> theory of products-liability tort actions, for that theory and cause
> of action, and the underlying social policies, expressly disclaim
> imposing a duty upon one who has no ability to control the
> circumstances and events which preceded a specific plaintiff's
> injury. Nor can the product line theory find a basis in traditional
> tort law which requires (1) the imposition of a legal duty to
> conduct oneself in a manner that does not pose an unreasonable
> risk of harm to others, and (2) a breach of that duty by the one
> upon whom it is imposed by law.

*Griggs v. Capitol Mach. Works, Inc.*, 690 S.W.2d 287, 292–93 (Tex. App.

1985) (cleaned up). *See also Hamaker v. Kenwel-Jackson Mach., Inc.*,

387 N.W.2d 515, 521 (S.D. 1986) ("[I]t would be liability without duty which

cannot be reconciled with our adoption of the rule of strict liability in tort

[pursuant to § 402A].").

Turning to the justification that the successor profited from its

predecessor's goodwill, courts have noted that the value of the goodwill that

the successor acquired for use in continuing the product line is a remote

benefit that "was considered and negotiated for at the time of the sale and

constituted part of the sale price. To hold the successor liable for defects in

products manufactured by the predecessor would be forcing the successor to

pay twice for goodwill." *Semenetz v. Sherling & Walden, Inc.,* 7 N.Y.3d

194, 200–01, 851 N.E.2d 1170, 1174 (N.Y. 2006) (cleaned up). Further, the

successor is double-paying for an asset that has a decreased value through no fault of its own because the acquired good reputation of the product line "is tarnished whenever defective products manufactured by the predecessor are discovered, lowering the value of the goodwill paid for by the successor." Timothy J. Murphy, *A Policy Analysis of a Successor Corporation's Liability for its Predecessor's Defective Products when the Successor Has Acquired the Predecessor's Assets for Cash*, 71 Marq. L. Rev. 815, 835 (1988).

Under the product line exception, the successor is thus charged with responsibility "not for something it has done, but rather because it may be able to afford liability." **Fish v. Amsted Indus., Inc.**, 376 N.W.2d 820, 827 (Wis. 1985). This approach in no way serves the policy goal of encouraging modified behavior by the tortfeasor. The unfortunate fact that the injured consumer may not be able to recover from the responsible party, which is cited by courts as a reason for adopting the product line exception, is a mere statement of a predicament, not a reason for making the successor pay. **See Guzman**, 567 N.E.2d at 931 ("[T]he plaintiff's lack of a remedy against the original manufacturers is not a justification for imposing liability on another absent fault and causation."); **Downtowner, Inc. v. Acrometal Products, Inc.**, 347 N.W.2d 118, 123 (N.D. 1984) ("[T]hat an injured party has lost his remedy against the original corporation and has no one to sue but the successor . . . is not a justification, it is the problem.").

Additionally, adoption of the exception has a chilling effect on business. As the High Court of New York Court explained:

> Importantly, the product line exception threatens economic annihilation for small businesses. Because small businesses have limited assets, they face potential financial destruction if saddled with liability for their predecessors' torts. This threat would deter the purchase of ongoing businesses that manufacture products and, instead, force potential sellers to liquidate their companies. As the Florida Supreme Court has observed, 90% of the nation's manufacturing enterprises are small businesses, and if small manufacturing corporations liquidate rather than transfer ownership, the chances that the corporations will be replaced by other successful small corporations are decreased.

*Semenetz*, 851 N.E.2d at 1174 (cleaned up) (citing ***Bernard v. Kee Mfg. Co., Inc.***, 409 So.2d 1047 (Fla. 1982)).

Further, it is not at all clear that the successor will be in a position to spread the economic risk of injuries because "[i]t is one thing to assume that a manufacturer can acquire insurance against potential liability for its own products and another to assume it can acquire such insurance for the products made by a different manufacturer." ***Id***. (cleaned up) (quoting ***Fish***, 376 N.W.2d at 828). One commentator offered the following reasoning:

> First, it is implausible that the successor corporation will be able to obtain the necessary insurance coverage. Unlike the multimillion dollar corporation, which can self-insure, the smaller manufacturer must obtain commercial insurance. Yet, it is quite probable that an insurance company will not insure against risk of accidents induced by articles that were placed in the market before the successor acquired the business. One possible reason could be that the successor's exposure to liability from the predecessor's products, coupled with potential liability from its currently distributed products, would place the successor's level of risk at an unacceptable high ranking. An insurance company will not insure an entity with an extremely high level of risk

because it would upset the equilibrium at which an insurance company operates.

Second, if insurance coverage were available to the successor corporation, it would not be affordable. It is axiomatic that if the commercial insurer were to provide the necessary insurance coverage, the successor's premium would reflect the increased exposure to risk. Coupled with the dramatic increase in insurance premiums . . ., the availability of affordable insurance for the small manufacturer is nearly nonexistent. In a competitive market, if the successor manufacturer were to invest in insurance coverage for its currently distributed products—and the products distributed by its predecessor—it would not be able to competitively price its goods. The successor is left with no alternative but to forsake insurance, thereby precluding its ability to spread the risk of accident costs.

Carol A. Rogala, *Nontraditional Successor Product Liability: Should Society Be Forced to Pay the Cost?*, 68 U. Det. L. Rev. 37, 57–58 (1990) (footnotes omitted). ***See also Semenetz***, 851 N.E.2d at 1174 ("[S]mall manufacturers have a difficult problem obtaining products liability insurance and find it impossible to cover the risks by raising prices because they have to compete with large manufacturers who can keep the price down." ***Id***. (cleaned up)).

Finally, many courts declining to adopt the product line exception opined that such a "radical change from existing law implicating complex economic considerations" was "better left to be addressed by the Legislature" than by the Courts. ***Id***. at 1175 (cleaned up). ***See also***, ***e.g.***, ***Winsor v. Glasswerks PHX, L.L.C***., 63 P.3d 1040, 1049 (Ariz. Ct. App. 2003) (holding that expanding scope of corporate liability was a question for the legislature); ***Pearson ex rel. Trent v. Nat'l Feeding Sys., Inc***., 90 S.W.3d 46, 52 (Ky. 2002) (same); ***Niccum v. Hydra Tool Corp.***, 438 N.W.2d 96, 99–100 (Minn.

1989) (same). For corporate law is what the exception modifies, not tort law.

*See Manh Hung Nguyen v. Johnson Mach. & Press Corp.*, 433 N.E.2d 1104, 1109 (Ill. App. Ct. 1982) ("Strict liability law has no principles to determine successor corporate liability.").

For these reasons, were this Court writing on a clean slate, or had Checkers not waived the argument that this Court should reverse its adoption in this jurisdiction, I would reject the product line exception as an additional exemption from the general rule that the purchaser of assets of one corporation does not acquire the liabilities of the seller. I would maintain the five traditional exceptions to that rule and leave it to our General Assembly to create any new ones if it deems it necessary as a matter of social and economic policy.

## III. The product line exception in Pennsylvania.

Of course, we are not today deciding the issue in the first instance. Although our High Court has yet to rule upon whether to expand successor liability for defective products, Pennsylvania joined the minority camp by this Court's recognition of a form of the product line exception in *Dawejko*.

### A. Pennsylvania currently employs a vague "just under the circumstances of the case" product line exception

In *Dawejko*, a three-judge panel of this Court approved the *Ramirez* formulation of the new exception to the rule of non-liability, declining "to phrase the new exception too tightly . . . , so that in any particular case the court may consider whether it is just to impose liability on the successor

corporation." **Dawejko**, 434 A.2d at 111. This Court highlighted the following factors that "will always be pertinent" to deciding whether the successor is properly held to account for its predecessor's defective product: "whether the successor corporation advertised itself as an ongoing enterprise; or whether it maintained the same product, name, personnel, property, and clients; or whether it acquired the predecessor corporation's name and good will, and required the predecessor to dissolve." **Id**. (cleaned up). The Court continued by observing that, "[a]lso, it will always be useful to consider whether the three-part test stated in **Ray** . . . has been met."[4] **Id**.

Applying its new rule to the case before it, the **Dawejko** Court affirmed a jury verdict against ACCO, the corporation that purchased the assets of Mansaver Industries, which had in 1957 manufactured the lifting machine that injured the plaintiff in 1972. The Court concluded that ACCO was properly

---

[4] To reiterate, those factors are:

> (1) the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business, (2) the successor's ability to assume the original manufacturer's risk-spreading role, and (3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business.

**Ray**, 560 P.2d at 9.

held responsible for the plaintiff's 1972 injury based upon the following facts

of record:

> After transferring its assets to ACCO, in 1964, Mansaver Industries, Inc., of New Haven, Connecticut, went out of business. The assets transferred included Mansaver's trademark and good will. The record includes a four[-]page manual regarding the "Mansaver standard headroom sheet lifter (hand-operated)." This was issued October 1, 1974, and was revised September 27, 1976. It bears the name "ACCO Industrial Lifters Division" on three of its pages; the third page, "Operating Instructions," is evidently carried over from the original manual, for it is identified as from "New Haven, Connecticut."

*Id*. at 112 (cleaned up). From this, the jury permissibly found

> that not only did [ACCO] purchase the assets of Mansaver Industries, Inc. of New Haven, Conn., but it continued to operate the business, manufacturing and selling the identified product as its assignor corporation had done. In acquiring the goodwill of Mansaver Industries, Inc. of New Haven, Conn., [ACCO] clearly evinced the intention to continue the business as it had existed. . . . That course of action shows a desire to capitalize o[n] the past performance and business carried on by the old corporation.

*Id*. (cleaned up). Notably absent from this discussion was any analysis of the

evidence as to the first *Ray* factor, namely that ACCO acquired virtually all of

Mansaver Industries' assets and that acquisition caused the destruction of the

plaintiff's remedies against Mansaver Industries.

The import of the *Ray* factors in the application of the product line

exception was at issue in this Court's subsequent decision in *Hill v.*

*Trailmobile, Inc.*, 603 A.2d 602 (Pa.Super. 1992). In that case, this Court

characterized *Dawejko* as holding that the product line exception "may **only**

be applied when [the three *Ray* factors] have **each** been established[.]" *Id*.

at 606 (emphasis in original). Yet, the **Hill** Court also acknowledged **Dawejko**'s refusal to state the exception in specific rather than general terms. **Id**. The **Hill** opinion suggested that the other considerations discussed in **Dawejko** pertained to the decision of whether it was fair in the particular circumstances of each case in which the **Ray** elements were all present to impose successor liability. **Id**. In other words, threshold proof of all the **Ray** factors was necessary to entitle a plaintiff to recover from a successor, but other considerations might nonetheless reveal it to be unjust to hold the successor liable despite the satisfaction of **Ray**. Ultimately, the **Hill** Court declined to extend the product line exception to allow a defendant to obtain indemnification from a co-defendant, deeming the case before it "particularly inappropriate" because the **Hill** plaintiff, in contrast with the **Dawejko** plaintiff, "had causes of action in strict liability against multiple defendants." **Id**. at 607.

This Court and federal courts applying Pennsylvania law after **Hill** operated under the assumption that the **Ray** factors were mandatory. **See**, **e.g.**, **Keselyak v. Reach All, Inc.**, 660 A.2d 1350, 1354 (Pa.Super. 1995) ("[S]ince the sale of the utility manufacturing line did not destroy any remedies against [the predecessors], the argument of appellants that the trial court erred in granting summary judgment in favor of [the successor] must be rejected as meritless."); **Forrest v. Beloit Corp.**, 278 F.Supp.2d 471, 477 (E.D. Pa. 2003) ("Plaintiff cannot successfully invoke the product line

exception because he has a potential remedy against the original manufacturer."). Indeed, even before **Hill** was decided, the United States Court of Appeals for the Third Circuit predicted that the Pennsylvania Supreme Court would not apply the product line exception "where the claimant had a potential remedy against the original manufacturer, but failed to exercise all available means to assert his or her claim." **Conway v. White Trucks, A Div. of White Motor Corp.**, 885 F.2d 90, 95 (3d Cir. 1989). **See also LaFountain v. Webb Indus. Corp.**, 951 F.2d 544, 548 (3d Cir. 1991) (same).

It appeared that we were poised to get a definitive ruling about the applicability of the product line exception in this jurisdiction when our Supreme Court granted allocatur in **Schmidt v. Boardman Co.**, 11 A.3d 924 (Pa. 2011), on the issue of, *inter alia*, "whether this Court should adopt the product line exception to the general rule of successor non-liability in strict products liability actions, and, if so, on what terms[.]" **Id**. at 927 (cleaned up). Alas, the appellant in **Schmidt**, like Checkers here, waived its challenge to "the viability of the product-line exception" by not raising it in the trial court or this Court. **Id**. at 942.

Accordingly, our High Court assumed for the purposes of disposing of the appeal that the exception was recognized in Pennsylvania. The Court then examined its contours as elucidated by the appealed-from panel decision in **Schmidt**. In particular, this Court had synthesized **Dawejko** and **Hill** thusly:

- 25 -

> [I]n **Hill**, this Court concluded that a plaintiff needs to provide evidence sufficient to establish the requirements of the three **Ray** factors in order for liability to attach to a successor under the product line exception. Therefore, as the only stated mandatory requirements of the product line exception in Pennsylvania, the three **Ray** factors are our central focus. If a plaintiff adduces enough evidence to fulfill these factors, we will then analyze the **Ramirez** test and the various factors stated in **Dawejko** to determine whether the jury, on balance, was provided with sufficient evidence to find that it is just to impose liability on the successor corporation.

**Schmidt v. Boardman Co.**, 958 A.2d 498, 507 (Pa.Super. 2008) (cleaned up). This Court also held that, in determining whether the successor acquired virtually all the predecessor's assets, "only those assets that are directly related to the product line at issue are relevant," and evidence of other available assets of the predecessor were properly excluded. **Id**. at 517.

After noting the awkwardness of "address[ing] the boundaries of the product-line exception, where [it] have not yet decided on developed reasoning whether to adopt it in the first instance," our Supreme Court proceeded to clear up the confusion manifest in the opinions of this Court and the trial court "which ar[ose] from inconsistencies in the Superior Court's application of the exception it has adopted." **Schmidt**, 11 A.3d at 944. The Court ruled that **Dawejko** and **Hill** were irreconcilable, and that "the **Schmidt** panel's elevation of the **Ray** factors to mandatory status was based on a plain misreading of the seminal product-line decision in **Dawejko**." **Id**. at 945. On this issue, the Court concluded that "the most appropriate approach to reconciling governing Superior Court precedent is to correct **Hill**'s mistake and

- 26 -

to revert to **Dawejko**." **Id**. As to the evidentiary issue, the Court found "untenable" the bright-line rule that only assets related to the product line in question were relevant to the consideration, observing:

> It is impossible, for example, to say with confidence that a sale of a portion of a company's assets caused the virtual destruction of a plaintiff's remedies if the fact finder does not know the full range of those assets in the first instance, and how the majority of them were disposed of by the manufacturer.

**Id**. at 945–46.

In the end, the **Schmidt** Court took care to be clear that its ruling was neither an endorsement of the product line exception or **Dawejko**'s formulation of it:

> [W]e take this opportunity to highlight several other matters which are not resolved by our present opinion. First, as noted, the case is not a suitable vehicle in which to resolve foundational concerns pertaining to Pennsylvania's strict products liability regime. The question of whether the product line exception should be maintained in Pennsylvania is waived, and, thus, our consideration of it is postponed. The issue of whether a determination of product line successor status is for the judge or the jury is not before us. . . . It is likewise beyond the scope of this appeal to engage in the fact-specific, sufficiency-like assessment concerning **Dawejko**'s application in this case . . . .
>
> We hold only that, under the most appropriate reconciliation of presently prevailing Superior Court precedent, the trial court did not err in its main instruction to the jury—under **Dawejko**—concerning the product line exception.

**Id**. at 946 (cleaned up).

Such is the state of Pennsylvania law concerning the product line exception to the rule against successor liability.

**B.      I would rule in the case *sub judice* that the first *Ray* factor is mandatory.**

As it stands, the controlling precedent as to the product line exception is the pronouncement of a three-judge panel of this Court in **Dawejko** that a successor's liability for its predecessor's defective product is a nebulous weighing of certain enumerated factors, all of which are relevant but none of which is definitive, to arrive at what is a just result.  Within the limits of issue preservation and waiver doctrine, this Court now sits with the ability to reconsider that holding, as our Supreme Court in **Schmidt** did not endorse the **Dawejko** formulation on its merits, and "[a]n *en banc* panel of an intermediate court is authorized to overrule a three-judge panel decision of the same court." **Commonwealth v. Rosario**, 294 A.3d 338, 352 (Pa. 2023) (cleaned up)).

In light of this authority, constrained by Checkers' waiver of the argument that we should reject the product line exception *in toto* as is detailed in Judge Beck's concurrence, it is my view that this Court should today hold that the product line exception cannot be utilized to impose liability upon a successor corporation unless the plaintiff proves that the successor deprived the plaintiff of a remedy from the manufacturer of the defective product through the act of acquiring virtually all the predecessor's assets.

As discussed above, the **Ramirez** formulation of the exception, adopted by **Dawejko**, does not require proof that the successor's acquisition caused "the virtual destruction of the plaintiff's remedies against the original

manufacturer," *i.e.*, establishment of the first **Ray** factor.  **See Ray**, 560 P.2d at 9.  However, the exception as stated by **Ramirez** becomes applicable in situations "when one corporation acquire[d] all or substantially all the manufacturing assets of another corporation[.]"  **Ramirez**, 431 A.2d at 825.  In other words, under both **Ray** and **Ramirez**, a successor is not liable to a plaintiff for injuries caused by a product manufactured by its predecessor unless it bought the predecessor's whole business.  As the Supreme Court of Washington, which adopted the **Ray** formulation, explained:

> The policy justifications for our adoption of the product line rule require the transfer of substantially all of the predecessor's assets to the successor corporation as a prerequisite to imposing liability on the successor.  Two compelling rationales are inherent in this requirement.  First, in keeping with the social policies underlying strict product liability, the product line rule is one of necessity.  Absent such a rule, the injured plaintiff is left without meaningful remedy.  Second, elemental fairness demands that there be a causal connection between the successor's acquisition and the unavailability of the predecessor.  Thus, the product line rule strikes a balance between the necessity of compensating the injured plaintiff and the fairness of requiring causation on the part of the defendant.  When . . . there has been no complete transfer of assets, the element of necessity is not present as the plaintiff may look to the original manufacturer; and further, [when] the sale of the product line has no connection to [the predecessor's] present financial condition [of a pending bankruptcy].

**Hall v. Armstrong Cork, Inc.**, 692 P.2d 787, 791 (Wash. 1984).

To the extent that **Dawejko** abandoned that *sine qua non* of the product line exception in favor of a nebulous fairness test to be decided on a case-by-case basis by the jury, I would, unlike the Lead Opinion, grant Checkers'

- 29 -

request that we "elevate the first **Ray** factor to mandatory status." Lead Opinion at 23.

C. **Application of the modified exception in the instant case mandates a finding that Checkers is not liable as product line successor to IAT**

As the Lead Opinion describes at length, the evidence at trial, viewed in the light most favorable to the Burnleys as verdict-winners, sufficed to sustain the finding that Checkers was liable as a successor under the **Dawejko** formulation. **See** Lead Opinion at 27-34. As I see it, given its nebulous fairness judgment call that does not require proof of any critical element or elements, it is hard to imagine an assailable jury assignment of liability pursuant to **Dawejko** in any case in which a company acquired the product line through an asset purchase.

However, if the first **Ray** factor is a critical element, as I maintain should be the case, then Burnleys' evidence unquestionably fell short. The trial court explained:

> The Burnleys did not . . . present evidence sufficient to prove "the virtual destruction of plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business." Uncontested evidence showed that IAT continued to exist, do business as a manufacturer of intelligent camera cranes, and pay creditors for at least three years after it sold its cable protector business to Checkers (and at least two years after the Burnleys filed suit). IAT received a substantial payment from Checkers for the cable protector business, plus the right to a future stream of income, and there was no evidence that these proceeds were diverted or dissipated outside IAT. Most importantly, the Burnleys did not show that they had tried to seek compensation from IAT. It is difficult to see how a plaintiff can demonstrate the virtual destruction of [his or her] remedies

- 30 -

without introducing evidence that it had pursued those remedies; the Burnleys certainly did not make that showing here.

The evidence that the Burnleys point to on the issue of virtual destruction of remedies is not helpful to them. The representation in the APA that IAT did not have insurance with respect to its properties, assets and operation of its cable protector business as of April 1, 2015, without more, cannot be read to mean that IAT lacked insurance, at the relevant times, that would have covered liability for a product sold more than a year earlier. The APA also cannot be read to show that IAT did have insurance coverage at some point that ceased to exist because of the asset sale. Similarly, [the] testimony [of FallLine's president Eric York] as to what he saw in IAT's books in early 2014 is not sufficient to show that the sale to Checkers virtually destroyed the Burnleys' remedies. Mr. York's review occurred eighteen months before the substantial cash infusion that IAT received from Checkers and, possibly, before the significant shareholder investment disclosed in the APA.

Trial Court Opinion, 7/10/23, at 24-25 (cleaned up).

The Burnleys argue that they satisfied their burden by proving IAT's dearth of assets other than the Firefly line at the time of her injury, the lack of assets or insurance at the time the APA was executed, and the fact that IAT was left insolvent with more than $500,000 in debt when it sold the assets to Checkers. *See* Burnleys' brief at 35-37. They further claim that it is of no moment that IAT was still in business in 2018, asserting that "[w]hat is relevant is whether Checkers purchased all assets of IAT during the period of time in which plaintiffs could have sued IAT." *Id*. at 37.

The Burnleys' position is inconsistent and logically flawed. First, their view of what timeframe is important is capricious, pointing alternatively to the time of the injury, the time of the APA, and the aftermath of the APA, and

ultimately suggesting that the fact that the asset sale occurred during the two-year statute of limitations was determinative. The Burleys' argument fails to appreciate that the question is whether they produced evidence to establish that IAT was unavailable to provide a remedy due to Checkers' acquisition of the assets, not to focus upon a static snapshot of IAT's bleak economic situation at certain points well before the statute expired. The fact that IAT was still in business in 2018, manufacturing a different product and still entitled to monthly earnings payments from Checkers, evinces that, regardless of the status of its financials when Mrs. Burley tripped on IAT's product or immediately following the execution of the APA, IAT was an entity that the Burnleys could have timely sued, and that it had acquired new assets other than those sold to Checkers.

Moreover, the Burleys' allegations regarding IAT's solvency do not support their conclusion that the product line exception is the necessary and appropriate justification for holding Checkers liable in this case. If, as the Burnleys suggest, IAT had become insolvent after the asset sale because Checkers paid inadequate consideration, the Burnleys could have sought to hold Checkers liable through other established exceptions to the rule of successor nonliability. *See Fizzano Bros.*, 42 A.3d at 954 n.2 (indicating that the exceptions recognized by our Supreme Court impose liability upon a successor where "the transaction was fraudulently entered into to escape

liability," or if "the transfer was without adequate consideration and no provisions were made for creditors of the selling corporation").

On the other hand, if IAT was insolvent despite Checkers paying fair value for the Firefly assets, then Checkers' acquisitions of those assets was not the cause of IAT's supposed inability to provide a remedy. As a California Court applying **Ray** aptly observed, "a causation element is necessary to ensure a plaintiff does not actually gain a windfall defendant not otherwise available." **Stewart v. Telex Commc'ns, Inc.**, 1 Cal.App.4th 190, 200, 1 Cal.Rptr.2d 669, 676 (Cal. App. 1991). **See also Downtowner**, 347 N.W.2d at 123 (observing that the successor "was not responsible for the destruction of the plaintiffs' remedy, where [the predecessor] had been threatened with foreclosure and was in receivership").

In my view, the circumstances of this case do not, on a fundamental level, justify imposition of successor liability on Checkers. "The product-line exception is a remedy which was created to afford relief to plaintiffs, victims of manufacturing defects who, due to the sale or transfer of the manufacturing corporation, **otherwise would have no avenue of redress** for injuries caused by defective products." **Hill**, 603 A.2d at 607 (emphasis altered). **Accord Cafazzo**, 668 A.2d at 525 (stating primarily "the availability of some entity for redress" in listing the considerations governing whether an actor in the supply chain is responsible for a defective product).

The Burnleys are not plaintiffs left to shoulder the cost of injuries caused by a defective product because the company responsible sold all the assets available to satisfy a judgment. The circumstances of this case are a far cry from the those detailed above in **Ray** and **Ramirez**. The Burnleys are plaintiffs who sought to recover, and did recover, from five other defendants, one of which (FallLine) was the company that manufactured and assembled the defective product that caused Mrs. Burnley to trip and fall. The product line exception is a last-ditch effort to ensure that an injured party is not left to bear the full economic cost of her injury. It is not a tool for plaintiffs to forgo pursuit of a remedy against the predecessor tortfeasor in favor of a deeper pocket. **See Keselyak**, 660 A.2d at 1353–54 (affirming grant of summary judgment for successor where the plaintiff had causes of action against viable, insured companies from which product line originated); **LaFountain**, 951 F.2d at 548 ("[T]he existence of a potential remedy against the actual manufacturer destroys the basis for invoking the product line exception.").

Stated plainly, the certified record reveals that the aims of neither strict liability nor the product line exception are furthered by requiring Checkers to pay for injuries to the Burnleys that it had no role in causing.

## IV. Conclusion

In sum, it is my position that **Dawejko** was wrongly decided and Pennsylvania should join the majority of jurisdictions in rejecting its expansion

of successor liability. Since we cannot achieve that result in this case due to Checkers' failure to preserve the issue, I would herein limit the abrogation of *Dawejko* to making the first *Ray* factor mandatory. Applying that standard, I would hold that Checkers is entitled to judgment notwithstanding the verdict because the Burnleys failed to establish that Checkers' acquisition of IAT's assets left them without redress. On the contrary, the certified record shows not only that IAT was available for the Burnleys to pursue as a defendant, but that they in fact recovered from two other companies that also breached their duty to manufacture and sell a safe product. Checkers caused the Burnleys no harm and cannot be held accountable for their injuries. This resolution of the appeal would render the remainder of the parties' issues moot.[5] For these reasons, I respectfully dissent from the Lead Opinion's decision to affirm the judgment against Checkers.

_____

[5] One of these issues is whether the question of successor liability is for the court or the jury to decide. Despite the mootness of this matter, I observe that we have viewed the applicability of the traditional exceptions to the rule against successor nonliability as a question for the jury where: (1) there is sufficient evidence to support an exception, and (2) there are disputes of fact relevant to the exception's applicability. *See*, *e.g.*, *Sehl v. Vista Linen Rental Serv. Inc.*, 763 A.2d 858, 863–64 (Pa.Super. 2000) (ruling that the trial court correctly charged the jury on successor liability based upon an alleged asset transfer without adequate consideration, but did not err in declining to instruct the jury on other exceptions because there was "insufficient evidentiary foundation to support instructions on those exceptions"). *See also Bird Hill Farms, Inc. v. U.S. Cargo & Courier Serv., Inc.*, 845 A.2d 900, 903–04 (Pa.Super. 2004) (holding that the trial court properly decided at summary judgment whether the successor implicitly agreed to assume the predecessor's lease where the pertinent facts were not in dispute).